# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## WACO DIVISION

BEBA LLC and
DEFI EDUCATION FUND,

                        Plaintiffs,

         v.

SECURITIES AND EXCHANGE
COMMISSION; and
GARY GENSLER, Commissioner of
the Securities and Exchange
Commission, in his official capacity,

                       Defendants.

Case No. 6:24-cv-153-ADA-DTG

## <u>FIRST AMENDED COMPLAINT</u>

Plaintiffs file this complaint against Defendants for declaratory and injunctive relief.

## NATURE OF THE ACTION

1.      Beba LLC is a small apparel company based in Waco, Texas. Beba was started by two brothers who grew up in East Africa, where they built relationships with local craftspeople who create beautiful handmade goods. Beba now sells handmade luggage and accessories made by those craftspeople through its online store. It compensates the craftspeople well, celebrates their work, and supports their families.

2.      Beba has, like many businesses, incorporated digital assets into its business. Its founders believe that digital assets and blockchain technology promise a better future for people around the world and they use digital assets in connection with marketing Beba's apparel.

3.      At the center of this lawsuit is a new digital asset—also referred to as a token—that Beba has created, called the "BEBA token." The BEBA token can be redeemed for an exclusive product from Beba's online store that will be available only to token holders.

4.      Beba initially distributed and plans to continue to distribute the BEBA token through an "airdrop." An airdrop is a common means of distributing a new digital asset to preexisting digital asset users. Typically, an airdrop involves a token developer sending a token—for free—to users' pre-existing public "wallets," or accounts. From a technical standpoint, the recipients need not proactively do anything to receive or accept such a token and they may or may not be expecting the airdrop. Airdrops are free giveaways.

5.      Beba is airdropping its BEBA token for free. After the airdrop, recipients have discretion over what they do with the BEBA token. They can redeem a certain number of the BEBA tokens for an exclusive duffel bag that Beba has made available only to token holders at a discounted price. Alternatively, they can hold the BEBA token or trade it. Beba has already airdropped BEBA tokens to users and has concrete plans to airdrop more BEBA tokens in the future in a similar manner and for similar purposes.

6.      The Securities and Exchange Commission, however, will take the position that BEBA tokens are investment contracts and that the airdrop is a securities transaction subject to registration requirements under the Securities Act of 1933. The SEC, which has authority to regulate transactions involving securities, has adopted an aggressive and expansive view of its own authority to regulate virtually all digital assets and transactions involving digital assets.

7.      Before the SEC adopted an overly broad view of its authority over transactions involving digital assets, the SEC at various points acknowledged that a digital asset "all by itself is not a security." Hinman, *Digital Asset Transactions: When Howey Met Gary (Plastic)*, SEC (June 14, 2018), bit.ly/2l8t5dB. As now-Chair Defendant Gary Gensler put it during this time, three quarters of the crypto asset market is "non-securities." Gensler, *Lecture Transcript: Blockchain and Money - Session 17: Secondary Markets and Crypto-Exchanges*, MIT (Fall 2018), tinyurl.com/3jpnxysn. During this period, the SEC brought fewer enforcement actions and focused them on primary issuances of

3

tokens for cash or other monetary consideration, often where the cases involved allegations of fraud or misconduct.

8.     Since Defendant Gary Gensler's appointment as Chair in 2021, the SEC has adopted a de facto rule, without notice or comment, that the "vast majority" of digital assets "*are* securities." Gensler, *Speech: Kennedy and Crypto*, SEC (Sept. 8, 2022), perma.cc/E3D5-QUBH (emphasis added). Chair Gensler "articulated a straightforward view of the agency's reach—that *pretty much every sort of crypto transaction* already falls under the SEC's jurisdiction except spot transactions in bitcoin itself and the actual purchase or sale of goods or services with cryptocurrencies." Khardori, *Can Gary Gensler Survive Crypto Winter?*, N.Y. Mag. (Feb. 23, 2023), nym.ag/3ZjbUXI (emphasis added). The SEC has engaged in no formal rulemaking addressing which digital assets transactions involve the offering of a security. Instead, it has issued these policy statements and an increasing number of enforcement actions, which collectively chill the marketplace and leave market participants struggling to discern the boundaries of this new policy.

9.     Under the SEC's new policy, a digital asset itself is presumptively an "investment contract," a type of security under federal law, and transactions involving a digital asset are almost always securities transactions subject to the SEC's authority. In the enforcement actions filed since adopting its new policy, the SEC has consistently alleged that the digital assets at issue represented investment contracts. The SEC takes this view regardless of whether the case centers around primary transactions—such as

the creation of new tokens—or secondary market transactions—such as the trading of tokens in a third-party marketplace.

10. The SEC has enforced this "poorly conceived crypto policy," *see Statement on ShapeShift AG*, SEC (Mar. 5, 2024), perma.cc/QW7P-ZFH8, against a wide range of participants in the digital asset economy, including everyday creators of digital assets, exchanges where digital assets are bought and sold, and other businesses that use digital assets. Since adopting its new policy, the SEC has markedly increased its enforcement actions against businesses that use cryptocurrency.

11. Before its new policy, the SEC tended to enforce against token creators directly. But under its new policy, the SEC expanded to more frequently enforce against secondary market token transactions, such as by bringing actions against digital asset trading platforms without naming token creators as defendants. *See* Cornerstone Research, *SEC Cryptocurrency Enforcement*, at 1, 3, 5-6 (2023 update), perma.cc/YQ5S-HE7T (showing that SEC brought a record high 46 enforcement actions against 123 crypto participants in 2023, a 53% increase from the 30 actions in 2022). In 2023, the SEC filed three major enforcement actions against digital asset trading platforms for registration violations. Compl., *SEC v. Coinbase, Inc.*, No. 1:23-cv-04738 (S.D.N.Y. filed June 6, 2023); Compl., *SEC v. Binance Holdings Ltd.*, No. 1:23-cv-01599 (D.D.C. filed June 5, 2023); Complaint, *SEC v. Payward, Inc.*, No. 3:23-cv-06003 (N.D. Cal. filed Nov. 20, 2023). In these cases, the SEC consistently alleges that the tokens at issue are "crypto

asset securities," causing harm to token creators and cutting them off from the dispute over whether their tokens are securities.

12.     The SEC has targeted initial distributions of tokens like Beba's. It has brought enforcement actions against token creators and companies that follow a similar model of creating tokens and airdropping them—even when they do so for free. And it has brought enforcement actions even when token creators like Beba make no enforceable promises to recipients about their ongoing efforts or potential expectations of profit.

13.     But the SEC gets the law wrong. As relevant here, Beba's airdrops are not securities transactions and BEBA tokens are not investment contracts. To be an investment contract, there must be an "investment of money" by the recipient in a common enterprise with a reasonable expectation of profit derived from the efforts of others. *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946). But the BEBA token airdrops are free, there is no common enterprise between Beba and token recipients, and there is no reasonable expectation of profits based on the efforts of others.

14.     Token recipients either do nothing to become eligible for the BEBA token airdrop, or they take an action that involves no money or meaningful consideration, like "following" Beba on social media. They do not pay Beba a penny or provide any other valuable compensation to Beba, so no investment of money—and therefore no investment contract—is made. Beba does not promise BEBA token holders that it will or will not undertake any efforts to increase the value of the BEBA token, so the airdrop

is not a contract at all, let alone one in which a recipient has a reasonable expectation of profits based on the efforts of others.

15.     Notwithstanding SEC policy statements and enforcement actions, the mere involvement of a digital asset does not transform every transaction into a securities transaction. Nor is the BEBA token itself an investment contract or any other type of security.

16.     In other words, Beba has engaged and plans to engage in a course of activity that is in fact compliant with securities law but that SEC policy has declared unlawful.

17.     The Declaratory Judgment Act exists for parties like Beba. Rather than forcing them to forgo their planned activities or live in fear of an enforcement action every day based on a federal agency's sweeping claims of novel authority, it allows them to seek a declaration that their activity is lawful. Beba therefore seeks a declaration that its airdrop of BEBA tokens is not a securities transaction and the BEBA tokens themselves are not investment contracts. That declaration will clarify Beba's legal rights and allow it to go forward with its business plan. And it will confirm that the SEC's use of incorrect legal theories in enforcing its digital asset policy—and the policy itself— goes too far.

18.     In addition to the Declaratory Judgment Act challenge, Beba—along with the DeFi Education Fund—also challenges the SEC's policy under the Administrative Procedure Act. DEF is a non-profit that advocates for the rights of participants in the

decentralized finance ecosystem—a sector of the digital asset space—and participates in that ecosystem and uses digital assets itself.

19.    To effectuate its policy governing digital assets, the SEC was required to go through notice and comment. The APA tells agencies that when they make new rules, they must do so openly, clearly, and with the benefit of public input. Yet, the SEC has finalized a policy that presumes most digital assets are securities and most transactions involving digital assets are securities transactions without doing so. Instead, based on its new policy, the SEC drastically increased the number of enforcement actions—often taking contradictory legal theories along the way—it brought against industry participants.

20.    The SEC adopted its new policy without any formal rulemaking process. The digital asset industry was forced to learn about this new policy through the SEC's enforcement actions, which provided only nominal analysis concluding that transactions involving digital assets were securities transactions—or that the digital assets themselves were securities—and little explanation or legal analysis. That behind-closed-doors policymaking approach deprived the digital asset industry and the public of its right under the APA to receive notice of and provide comments on the SEC's new policy. It left token creators at the mercy of actions to which they were not parties. And it left individuals unable to seek judicial review of the SEC's policy, allowing the SEC to hide its disregard for its statutory authority, and harming a wide range of digital asset users, including Beba and DEF.

21.     Beba and DEF therefore also ask the Court to hold the SEC to the terms of the APA. When the SEC adopted its policy that digital assets are presumptively investment contracts and that digital asset transactions are presumptively securities transactions, it had to go through notice and comment. As one SEC Commissioner lamented, "[a] notice-and-comment process [would have] allow[ed] broad public and internal participation in developing a sound regulatory system." Peirce, *Outdated: Remarks Before the Digital Assets at Duke Conference*, SEC.gov (Jan. 20, 2023), perma.cc/6PU7-HQXM (cleaned up) [hereinafter "*Peirce Digital Asset Conference Remarks*"]. The SEC must go through that process, hear from the American public, and subject its policy to proper legal review.

## THE PARTIES

22.     Plaintiff Beba LLC is a company incorporated and with its principal place of business in Waco, Texas.

23.     Plaintiff DeFi Education Fund is a nonpartisan research and advocacy group based in Washington, D.C.

24.     Defendant Securities and Exchange Commission is an agency of the federal government headquartered at 100 F Street, NE, Washington, D.C. 20549.  The SEC is charged with enforcing the federal securities laws, including the Securities Act of 1933, 15 U.S.C. §77a et seq., and the Securities Exchange Act of 1934, 15 U.S.C. §78a et seq.

25.     Defendant Gary Gensler is Chair of the SEC. He is sued in his official capacity. As Chair, Defendant Gensler is charged with making SEC rules and regulations, initiating enforcement actions, subpoenaing witnesses and requiring the production of evidence, appointing and supervising SEC personnel, and expending SEC funds. *See* 15 U.S.C. §§77a et seq.; 15 U.S.C. §§78a et seq.; *Reorganization Plan No. 10 of 1950*, 15 Fed. Reg. 3175, 64 Stat. 1265 (1950). Defendant Gensler played a central role in creating and implementing the SEC's new challenged policy and now enforces that policy.

## JURISDICTION AND VENUE

26.     This Court has jurisdiction under 28 U.S.C. §1331 and §1346(a)(2) because this case proceeds against an agency of the United States and arises under Administrative Procedure Act, 5 U.S.C. §500 et seq., the Declaratory Judgment Act, 28 U.S.C. §2201 et seq., the Securities Act of 1933, 15 U.S.C. §77a et seq., and the general legal and equitable powers of the judiciary.

27.     Venue is proper in this judicial district under 28 U.S.C. §1402(a)(1) and §1391(e) because Beba LLC has its principal place of business in McLennan County, Texas.

28.     Defendants are not entitled to sovereign immunity. Congress waived sovereign immunity for this action. *See* 5 U.S.C. §702. And a suit against an individual officer for injunctive relief is not a suit against the sovereign. *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 687-88 (1949).

## BACKGROUND

**I.      Beba LLC is a small Texas company that uses digital assets.**

29.      Beba is an apparel company headquartered in Waco, Texas.

30.      Beba sells high-end products handmade by local craftspeople in Kenya.

31.      Beba was founded by two brothers. Beba's founders spent their childhoods in Tanzania and Kenya, where they developed a love for the handcrafted and beautiful goods made and used there, and a strong desire to support the local community.

32.      The Beba founders also witnessed craftspeople being exploited and taken advantage of. They witnessed talented local creators who were not paid for their work, were underpaid, or were exploited for marketing purposes. They resolved to create a company that would spread the goods that these people made around the world while treating them with dignity and compensation commensurate with their talents.

33.      They officially incorporated Beba in Texas in 2022. Beba produces high quality handcrafted duffels, backpacks, and wallets.

34.      Beba's craftspeople are longtime tailors in Kenya. Beba pays their craftspeople considerably more than they would get from other local employers. Beba also pays for their workshop rent and electricity regardless of whether they are working on Beba orders or other work. And it features their stories on its website and celebrates their success. *See* Beba, *About Us*, bebacollection.com/pages/about-us. These craftspeople have become close with Beba's founders. As one tailor has put it, Beba's

founders have "become like family to me and through their Beba company have helped me in many areas of need beyond a simple paycheck." *Id.* The craftspeople rely on Beba to support their families.

35.     Beba has integrated digital assets into its own business. Digital assets are explained in detail in Section II. Beba believes that the digital asset ecosystem promises a better future for consumers and businesses around the globe. As many companies already have and many more will, Beba uses digital assets in connection with marketing its products and business and in growing its brand to reach a wider audience.

36.     Beba's founders believe in the transformative power of digital assets to make the world a better place. Growing up in Africa, they witnessed firsthand the deficiencies of the traditional financial system. As they saw, many people in the world lack bank accounts or access to any electronic means of payment through traditional financial intermediaries. Even those who do have access struggle to obtain business loans, cannot make cross-border payments, or cannot rely on existing systems that are plagued by corruption and instability.

37.     Beba's founders saw how digital assets could solve these problems. They saw that digital assets would give unbanked and underbanked people around the world a way to make payments to family, friends, or in the workplace, across borders or anywhere else. They saw that digital assets would open up stable sources of financing for businesses and new economic opportunities for people who could not get them from the old financial system. They also saw that the transparent technology underlying

digital assets could be used to audit expenditures, weed out corruption, and solve centuries-old problems in East Africa like claims to disputed real estate titles. Digital assets, they believe, will unlock the potential of the developing world and allow its people to build successful businesses and thrive.

38.     Beba has in the past released a series of digital assets in the form of non-fungible tokens, or "NFTs." The NFTs featured art promoting Beba's products and their connection to Kenya. *See* Beba Collection, Beba, perma.cc/2ZTT-L2XB. Beba launched these NFTs because it believes in the technology and because doing so would help promote its business.

39.     Beba is growing. It plans a future in which it expands its product line, introduces fashion apparel, continues to incorporate digital assets into different aspects of its business, and sells in its own storefronts in the United States, while continuing to celebrate its craftspeople in Kenya.

## II.     An introduction to digital assets.

40.     Digital assets first appeared in the 1990s, as the internet became widely accessible in people's homes, with cryptographer and computer scientist David Chaum creating the electronic money company "DigiCash." *See* Hyatt, *Decoding Crypto: What Was the First Cryptocurrency and Who Created It?*, NASDAQ (Aug. 18, 2021), perma.cc/4GK3-AJNA. Then in the early 2000s, video game developers created in-game tokens that could be used as currency in games such as Second Life and World of Warcraft, and created marketplaces to buy and sell tokens for gamers who did not

want to play through the tasks needed to earn them. Szalay, *A History of Cryptocurrency, from Gaming Tokens to a $2tn Market*, Fin. Times. (Nov. 29, 2021) perma.cc/AM6H-LF25. These tokens and the associated marketplaces "laid the foundations for the cryptocurrency industry." *Id.*

41.     The first widely used digital asset, Bitcoin, was created in 2008, and relied on the agreement of users to operate rather than on a centralized entity.  *See* Nakamoto, *Bitcoin: A Peer-to-Peer Electronic Cash System* (Oct. 31, 2008), perma.cc/AHE6-JPJ9.  Another major digital asset network, Ethereum, was launched in 2015. *See* Buterin, *Ethereum: A Next-Generation Smart Contract and Decentralized Application Platform* (Dec. 2014), perma.cc/P9U3-5FS4. Thousands of lesser-known digital assets have been created since then and are freely available to trade online. Digital assets may be called "tokens" or "coins."

42.     Now, 52 million Americans own digital assets. *See A Call to Action: Mobilizing 52 Million Crypto Owners Into An Army of One Million Advocates For Change*, Coinbase (Sep. 19, 2023), perma.cc/ZTJ7-9DBF.

43.     Digital assets can be easily created, distributed, sold, and purchased.

44.     Anyone can create a new digital asset using widely available computer code.

45.     Once a new digital asset is created, the creator can distribute the new digital asset to wallet "addresses" at a cost to the creator. The creator could also

distribute new tokens upon the satisfaction of certain conditions with or without a recipient's previous knowledge or permission.

46.     People buy and sell digital assets for a variety of reasons, including that they function as stores of value, serve as mediums of exchange, or carry intrinsic utility.

47.     Once someone acquires a new digital asset, the new owner can trade it with others through several mechanisms. He can trade his new digital asset through direct transactions with other people, using an online trading platform where large numbers of people buy and sell assets through an intermediary, or using a decentralized exchange protocol for peer-to-peer transactions without an intermediary.

48.     In the secondary market, anyone can trade digital assets with fiat currency, such as U.S. dollars, or with other digital assets. The market for digital assets resembles the market for other commodities, like gold, or other collectibles, like baseball cards.

49.     The market price in U.S. dollars of a digital asset is a function of many factors, including its supply, its popularity, and its utility.

50.     Many companies and people have created new digital assets and seen their market price increase due to the widespread appeal and excitement that they generate. For example, a wide range of companies have created digital assets associated with their company to promote their products and support the digital economy. *E.g.*, .*SWOOSH is the Home for Nike Virtual Products*, www.swoosh.nike (Nike); Flora, *Sephora Brings Sephoria to the Metaverse*, Glossy (Sept. 26, 2022), perma.cc/8NYQ-6HNY (Sephora). And many celebrities have created collectible digital assets and distributed them to fans,

much like merchandise or memorabilia. *E.g.*, *Welcome to the Huddle*, Autograph, perma.cc/5KZD-7VV3 (Tom Brady); Perper, *Snoop Dogg Drops New NFTs that Evolve with His Tour*, CoinDesk (June 13, 2023), perma.cc/W3A8-SELG (Snoop Dogg).

51.     Many tokens have intrinsic utility regardless of any ability to be bought or sold. *See Database*, TheValueProp, perma.cc/PQ8P-5AJ2. For example, a website host can limit admission to token holders. Lawyers can use a token to serve a complaint. *See* Westhoff et al., *Are You Being Served? Court Authorizes Service of Process Via Airdrop*, Nat'l L. Rev. (July 11, 2022), perma.cc/7ANZ-BCTK. And the State of California Department of Motor Vehicles created a blockchain based solution to tokenize vehicle titles. *See* Canny, *California Leads the Way as U.S. Federal, State Agencies Consider Blockchain's Applications: Bank of America*, CoinDesk (Mar. 24, 2023), perma.cc/CAU9-9STY; *Oxhead Alpha Demonstrates Blockchain Based Vehicle Title System for California DMV*, Oxhead Alpha (Jan. 25, 2023), perma.cc/QSV4-H837.

52.     When someone acquires a digital asset, he does not automatically, or ordinarily, enter into any ongoing contractual relationship with the seller or creator of that digital asset. Instead, he possesses and holds the digital asset outright, often with the hope that it will increase in value based on market forces, just like someone who holds any other sort of asset, commodity, or memorabilia with potential resale value.

53.     The digital asset industry makes up a major portion of the American economy.

54.     About 20% of Americans have purchased a digital asset, amounting to 52 million Americans.

55.     Thousands of American businesses now accept digital assets as a form of payment. Instead of buying goods and services with cash or credit cards, people can now buy them with digital assets instead. *The Use of Cryptocurrency in Business*, Deloitte (June 2023), perma.cc/R9ZR-7Y5G; Hall, *Can You Buy A House With Bitcoin?*, Bitcoin Magazine (May 26, 2022), tinyurl.com/3w6vz2wp. You can now even buy a cup of coffee with digital assets. *See* Terrett, *DC Coffee Chain Debuts Crypto Payments with Coinbase Partnership*, Yahoo! Finance (Mar. 20, 2024), perma.cc/BLH2-N2FW.

56.     The digital asset industry has a market capitalization of over $2.5 trillion. *See Cryptocurrency Prices Today by Market Cap*, Forbes (accessed Mar. 23, 2024), perma.cc/5FMW-9TWA. The daily trading volume of digital assets is in the tens of billions of dollars. *Today's Cryptocurrency Prices by Market Cap*, Blockworks (accessed Mar. 23, 2024), perma.cc/HW23-S2NL. The digital asset industry has created hundreds of thousands of jobs for programmers, engineers, and entrepreneurs.

57.     The digital asset industry market capitalization is projected to reach $7.5 trillion by 2025. Hunt, *Bernstein Predicts Crypto Market Cap Could Grow to $7.5 Trillion by End of 2025*, The Block (Mar. 14, 2024), perma.cc/HVC7-VCT4.

58.     Digital assets are now traded in "exchange-traded funds," or ETFs. Established financial players like Blackrock and Fidelity offer Bitcoin ETFs, allowing anyone to invest in digital assets through their traditional financial firm.

59.     Digital assets have had a positive influence on the world. Three aspects of their transformative potential stand out:

60.     First, digital assets allow people without access to banks to participate in the financial system. Digital assets give these people the ability to transact globally without a bank account or other institutional affiliation. They thereby provide financial opportunity to unbanked persons in underserved communities around the world. *See* Kraken, *Banking the Unbanked: Why Emerging Markets Dominate Crypto Adoption*, Fin. Times, perma.cc/VG5W-W63J. For example, more than $117 billion in digital asset payments was sent to sub-Saharan Africa between June 2022 and July 2023, allowing Africans to participate in the global economy in ways they couldn't before. *See* Chainalysis, *The Chainalysis 2023 Geography of Cryptocurrency Report,* at 78-83 (Oct. 2023), *available at* perma.cc/7K7A-J5SM (noting political instability, rising inflation, and cash shortage for the unbanked led to greater adoption of cryptocurrencies); Chapiro, *Working Toward Financial Inclusion with Blockchain*, Stan. Soc. Innovation Rev. (Nov. 24, 2021), perma.cc/CPF9-PP86. Approximately 6% of Americans, mostly lower-income Americans, have no bank account. Unsurprisingly, a significant share of those who use digital assets in transactions are exactly those unbanked Americans. *See Economic Well-Being of U.S. Households in 2021*, at 43-46, Fed. Rsrv. (2022), perma.cc/VU5M-WXKV; *see also* Chapiro, *Working Toward Financial Inclusion with Blockchain*, *supra.*

61.     Second, digital assets allow people to make charitable contributions around the world. For example, after a catastrophic earthquake hit Turkey and Syria last

year, digital asset technology allowed people to immediately send over $5 million in aid to the afflicted communities, without going through intermediaries or needing to convert their currency. *Crypto Donations Provide Fast Relief for Earthquake Victims in Turkey and Syria*, Chainalysis (Feb. 21, 2023), perma.cc/8Y4T-KCRV. Digital assets are especially valuable in enabling charitable contributions beyond the control of repressive regimes. For example, during Russia's invasion of Ukraine, the Ukrainian government raised over $225 million in digital assets to support its defense efforts. *See id.*; Baydakova, *Ukraine Has Raised $225M in Crypto to Fight Russian Invasion, but Donations Have Stagnated Over the Last Year: Crystal*, CoinDesk (July 27, 2023), bit.ly/3xaglLX; *How Is Ukraine Using Crypto to Fund the War?*, The Economist (Apr. 5, 2022), econ.st/3J7l8kA.

62.    Third, digital assets allow people to participate in a more efficient and user-friendly global economy. They allow people to send funds to friends and family in a matter of minutes and without paying exorbitant fees. They provide 24/7 liquidity and access to markets, reduce settlement times and fees, and provide protection against inflation and other perils of the traditional financial system. *See Crypto Could Help Save People in the US Billions of Dollars a Year in Remittance Fees*, Coinbase (Apr. 3, 2023), tinyurl.com/msj3mxjk; Wheatley & Klasa, *Cryptocurrencies: Developing Countries Provide Fertile Ground*, Fin. Times (Sept. 5, 2021), on.ft.com/3SPS7x9 ("According to the World Bank, the cost of sending $200 to countries in sub-Saharan Africa averaged 9 percent of the transaction value … On peer-to-peer crypto networks, however, these fees are typically about 2-5 per cent.").

63.     For these reasons and more, digital assets have been widely embraced across the political spectrum as a promising new frontier for American innovation and the public good. *E.g.*, Stewart*, Cryptocurrency Gets Warm Texas Welcome from Gov. Abbott*, Houston Chronicle (Jun. 22, 2021), bit.ly/3PwLVK5; Sigalos, *New York's Incoming Mayor Says Crypto Should Be Taught in Schools*, CNBC (Nov. 8, 2021), cnb.cx/3vdGu7F; *Gov. DeSantis Seeks 'Crypto Friendly' Florida*, CBS Miami (Dec. 10, 2021), cbsloc.al/3riBn52; Yaffe-Bellany, *The Rise of the Crypto Mayors*, N.Y. Times (Jan. 25, 2022), nyti.ms/3O4MUyB.

64.     Digital assets have been especially embraced here in Texas, which has taken on a leading role in digital asset activities worldwide. *E.g.*, Lieber, *Texas Wears the Crown as the Bitcoin Mining Capital of the World*, Dallas Morning News (Nov. 1, 2023), bit.ly/3vnsIDF; Pollard, *Texas Republicans Want to Make the State the Center of the Cryptocurrency Universe*, Texas Trib. (Oct. 28, 2021), perma.cc/EC6U-NVRP; *Innovation & Technology Caucus of the Texas Legislature*, perma.cc/N3HG-ZFR8; *Texas Blockchain Council*, perma.cc/94AM-EHYJ.

### III.   Beba LLC airdrops its digital asset.

65.     Beba created the new digital asset at issue in this case—the BEBA token.

66.     Beba created 100,000 BEBA tokens.

67.     Beba created the BEBA tokens and distributed them on a popular digital asset network. It recently made its first airdrop of the token. It plans to do a second airdrop of the token.

68.     Beba announced that BEBA token holders are entitled to a special offer. Specifically, BEBA token holders are entitled to purchase one of an exclusive line of duffel bags, called the Ndovu Duffel, at a discounted price. The Ndovu Duffel will be available for $190—but only to those who hold 200 BEBA tokens.

69.     In other words, the BEBA token functions like customer loyalty points or airline miles, giving users access to a special benefit from Beba.

70.     But unlike those familiar products, the BEBA token can also be freely traded. Digital assets like the BEBA token often are traded on secondary marketplaces that facilitate such trades. The ability to trade digital assets like the BEBA token increases their value and allows Beba to reach a wider audience of potential customers.

71.     The duffel bag available exclusively to BEBA token holders is pictured below:



72.     As Beba's website explains, "The $BEBA token gives you exclusive access and benefits to the Beba ecosystem. For starters, the limited-supply new Ndovu Duffel will be accessible only to $BEBA token holders who redeem 200 tokens. Because the Ndovu will be discounted from the original Manyanga Duffel and have additional features, $BEBA tokens unlock one of our coolest new products at a discount." *See $BEBA Token,* Beba, bebacollection.com/pages/beba-token.

73.     BEBA tokens can be freely traded on popular digital asset networks.

74.     Beba anticipates that the BEBA tokens will increase in value. As Beba continues to excel as a business, its increased brand recognition and marketing efforts will increase the value of the BEBA token. Likewise, the utility and promotional effects of distributing the BEBA token will increase its value. BEBA tokens can increase in popularity and value as Beba becomes more popular and its products become more valuable.

75.     Beba also expects a robust secondary market will emerge for BEBA tokens, as has emerged for other, similar airdropped tokens. The BEBA tokens' success depends on their being freely exchangeable on the secondary market. A secondary market for BEBA tokens is necessary for them to get in the hands of likely buyers. It also allows Beba to grow their market and gain popularity. A digital asset that is freely exchanged can increase in value, get the attention of more potential buyers, and otherwise benefit Beba. Limits on the free exchange of the BEBA token stifle its potential.

76.     Beba anticipates that a secondary market for BEBA tokens will grow through, for example, the creation of a liquidity pool. Availability of BEBA tokens on a secondary market would provide a way for Beba to continue its marketing efforts by reaching a wider audience beyond those who received tokens from the airdrop.

77.     Beba fears making efforts to ensure there is a robust secondary market for BEBA tokens itself because it fears the SEC will be even more likely to bring an enforcement action against it if it does so. *See, e.g.*, *Coinbase* Compl. ¶196 (relying on similar efforts to justify enforcement); *accord Binance* Compl. ¶500 (same).

78.     Beba already distributed the first wave of BEBA tokens for free via airdrop. Beba received no money or other consideration in exchange for BEBA tokens.

79.     In its first airdrop, Beba distributed 60,880 BEBA tokens to users who did not ask for the token and were not aware they would receive the token. Beba airdropped the tokens to recipients by sending the tokens to the recipients' pre-existing wallet addresses on a common digital asset network. Participants in the digital assets world are accustomed to receiving free "airdropped" tokens in circumstances like these.

80.     Beba distributed BEBA tokens to two groups of recipients in the first airdrop, all for free.

81.     The first group of recipients included participants in other digital asset projects. Beba distributed BEBA tokens to users of Base Name Service, by airdropping tokens to the first 1,904 unique digital asset wallet addresses that created a domain name using Base Name Service. *See* www.basename.app.

82.     The second group of recipients included users of a similar token several years ago. Namely, these recipients had held a token named "Unisocks," created by a New-York based software development company, which allowed holders to redeem the token for a pair of distinctive pink and white tube socks. Those who kept their token saw its price go up as high as $171,000, and wearing the socks became a fashion statement in certain circles akin to wearing an exclusive line of Nike sneakers. Beba distributed BEBA tokens to only those users who did not keep the token but instead redeemed their Unisocks token for the pair of socks.

83.     Beba has concrete plans to distribute more BEBA tokens in a second free airdrop. In its second airdrop, Beba will distribute tokens to three groups.

84.     First, Beba will distribute more BEBA tokens to the same users, just as it did before.

85.     Second, Beba will distribute additional BEBA tokens to users who claim BEBA tokens by completing a digital asset transaction, which will entail paying the general transaction, or "gas," fees required for any use of the network. Beba will announce the opportunity for some users to receive free tokens on its website and then users interested in receiving BEBA tokens will initiate a transaction to "unlock" the tokens. Interested users will not pay any money to Beba, but will have to pay gas fees to the network validators of transactions, in order to complete the "unlock" transaction.

86.     Third, Beba will distribute BEBA tokens to a limited number of the members of the general public who are the first to follow Beba on social media,

including on Warpcast, a popular decentralized social networking app, and to create a domain name that includes "Beba" for their wallet address using the Base Name Service. For example, users can create a name such as "john-Beba.base." Once they have done those tasks, Beba will airdrop BEBA tokens to their personalized wallet on the Base network.

87.     Beba is ready and able to conduct this second airdrop, but it cannot do so given the SEC's policy that airdrops constitute securities transactions. It will do so once a court vacates that policy or declares it invalid.

88.     Beba will also hold some of the BEBA tokens with no plans to distribute them. It anticipates that the tokens will increase in value and that Beba will therefore benefit by accruing value to its balance sheet.

## IV.     The limits of securities law.

89.     Congress created the Securities and Exchange Commission in the 1930s to "restore public confidence in the symbols and the basic currency of the industrial era, namely, investment securities." Keller & Gehlmann, *A Historical Introduction to the Securities Act of 1933 and the Securities Exchange Act of 1934*, 49 Ohio State L. J. 329, 330 (1988). In the previous decades, sales of securities—namely, ownership shares in corporations—had increased exponentially. *Id.* at 331. That growth came with problems, especially that dishonest actors created "corporations" that existed in name but did not do anything. They then sold ownership shares in those corporations to the public. Recipients of ownership shares, who believed they had an ongoing claim over a

25

profitable business enterprise like an oil company, in reality had been defrauded. *Id.* at 333-35.

90.     Congress passed the Securities Act of 1933 and the Exchange Act of 1934 to address this problem. Those Acts created the SEC. They also required sellers of securities to register with and make disclosures to the SEC before being allowed to proceed and penalized unregistered or noncompliant transactions. As a result of those Acts, it is unlawful to deal in securities without SEC pre-approval, which can be nearly impossible and costly to obtain.

91.     But because the problem was limited to securities, so was the solution. Congress limited the SEC's regulatory domain to transactions involving "securities." And Congress defined "securities" narrowly. Securities are formal financial instruments like "stocks," "bonds," and "security futures." 15 U.S.C. §77b(a)(1); *see* 15 U.S.C. §78c(a)(10) (similar).

92.     As relevant here, securities have also always included "investment contracts." 15 U.S.C. §78c(a)(10); 15 U.S.C. §77b(a)(1). Investment contracts are understood as another form of legally binding agreement or arrangement in which a buyer would pay money to a business venture in exchange for a share of future profits in that venture. Under the famous "*Howey* test," the Supreme Court has defined investment contracts as requiring (1) an investment of money (2) in a common enterprise (3) with a reasonable expectation of profit derived from the efforts of others. *See Howey*, 328 U.S. at 301. The Supreme Court has said, by way of example, that when

a citrus farming company sells land to passive investors and contracts with them to lease that same land back to farm and remit profits from the farming enterprise to the investors, that arrangement is an "investment contract." *Id.* at 299-300.

93.     Most economic transactions, including most made for investment purposes, are not investment contracts or any other form of securities. *See Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994) (explaining that an investment contract requires "something more" than the mere sale of an asset; it requires "the opportunity to join in a 'common enterprise'"); *see also Rodriguez v. Banco Cent. Corp.*, 990 F.2d 7, 11 (1st Cir. 1993) ("what was purchased in this case was not a share of a business enterprise and so not a security" and "[neither] the promoter [n]or any other obligated person or entity was promising the buyers to . . . provide anything").

94.     Purchases of commodities—like other valuable goods such as gold and oil, or other collectibles like baseball cards and Rolex watches—are not "investment contracts" even though they are bought and sold as investments. And "investment contracts" do not include the purchase of currencies, even though they are bought and sold as investments.

95.     Congress had to amend the definition of "securities" in 1982 to give the SEC authority to regulate certain instruments traded on "exchange[s] relating to foreign currency" precisely because the purchase and sale of such currencies were not investment contracts or any other form of securities—even though of course people

bought foreign currency for investment purposes. 15 U.S.C. §78c(a)(10); *see* Pub. L. No. 97-303, §2, 96 Stat. 1409 (1982).

96.    In other words, when Congress created the SEC, it gave it no plenary power to regulate commercial transactions, investments, or distributions of new assets. In fact, most economic activity falls beyond the SEC's regulatory domain because it does not involve investment contracts or any other form of securities.

### V.    Beba's airdrops are not securities transactions and the BEBA tokens are not investment contracts.

97.    Airdrops like Beba's are not securities transactions, and the BEBA token itself is not an investment contract.

98.    BEBA tokens are not themselves investment contracts and the airdrop was not a securities transaction because there is no contract or scheme at all. BEBA token recipients do not agree to the terms of any contract or other arrangement in receiving the unsolicited airdrop. And Beba does not promise BEBA token holders that it will or will not do anything following the airdrop of BEBA tokens, other than honor redemptions of BEBA tokens for its exclusive line of duffel bags.

99.    BEBA tokens are assets. They do not inherently carry the features of an investment contract. Like gold, baseball cards, or many other assets, people might invest in them and they might become more valuable over time. But that does not make them investment contracts for the purposes of securities law.

100.   The airdrops involve no "investment of money" by the users who receive BEBA tokens. An "investment of money," as required for an investment contract, means what it says. It means a payment of actual money or similar compensation to the company or enterprise that serves as the co-party to the supposed investment contract. An investment of money does not include interactions where the recipient does nothing. It does not include interactions where the recipient pays someone besides the co-party. And it does not include interactions where the recipient participates in something that might offer an incidental benefit to the co-party, but does not pay it any money. It is common for people to do things that help someone economically, including things like following them on social media, but doing those things does not constitute an investment of money as that concept is properly understood in securities law.

101.   Beba has never *sold* BEBA tokens to the public and has no plan to do so. Beba has never accepted currency or assets in exchange for BEBA tokens in any forum. No group of recipients paid Beba for its BEBA tokens; they received the BEBA token for free. And its requested social media follows in its planned second airdrop do not involve the payment of any money. Beba's completed first airdrop and planned second airdrop therefore do not involve an "investment of money" and are not subject to the SEC's authority.

102.     Neither the airdrop nor the BEBA token form a "common enterprise" between Beba and token holders. BEBA tokens are akin to other commodities and collectibles, and giveaways of those commodities and collectibles.

103.     The airdrop is not a securities transaction and the BEBA tokens are also not investment contracts because the recipients of BEBA have no *reasonable* expectation of profits based on Beba's managerial or entrepreneurial efforts. Beba may do work to enhance its brand and engage in marketing efforts, which could indirectly make tokens more valuable, just as Nike's marketing efforts increase the value of exclusive Nike sneakers. But Nike sneakers do not become investment contracts simply because they rise in value. Here, Beba has made no enforceable promises to BEBA token recipients that it will carry out any managerial or entrepreneurial efforts. Beba could shut down tomorrow and BEBA token recipients would have no recourse. Any expectation by BEBA token holders that they will earn some profit on BEBA tokens based on the efforts of Beba would not be reasonable as that requirement is properly understood in securities law.

104.     Congress has not amended the definition of "securities" to include digital assets. As discussed below, Congress is actively considering legislation that would create laws regarding market structure, securities and commodities regulation, and digital assets in general. Unless and until Congress acts, the SEC's new policy exceeds its authority.

### VI.   Beba faces a credible threat of enforcement because the SEC has targeted airdrops like Beba's.

105.   As explained in detail below, the SEC has adopted an unlawful policy under which there's a presumption that digital assets, including the BEBA token, are investment contracts and that digital asset transactions, including airdrops like Beba's, are securities transactions. *See infra*, VIII. The SEC has taken the position that the "vast majority" of digital assets themselves "are securities" because they represent an investment contract, and their initial distribution and later sale are unlawful without registration. *See* Gensler, *Speech: Kennedy and Crypto*, *supra* ("most crypto tokens are investment contracts under the Howey Test"). As one Commissioner has observed, the SEC now "repeat[s] the mantra that all, or virtually all, tokens are securities." *Peirce Digital Asset Conference Remarks*, *supra*.

106.   The SEC had previously provided public guidance about a "facts and circumstances test" when analyzing digital asset transactions under which "[w]hether a particular digital asset at the time of its offer or sale satisfies the *Howey* test depends on the specific facts and circumstances" of the transaction. *See Framework for "Investment Contract" Analysis of Digital Assets*, SEC (Apr. 3, 2019), perma.cc/9SNP-KN3A. Therefore, at that time, the SEC did not believe that digital assets were themselves inherently securities. Among other things, that approach meant that secondary-market transactions were largely excluded from the SEC's authority.

107.    The SEC then decided that digital assets themselves are securities, which significantly expanded its regulatory reach, which both indirectly and directly impacts token creators and issuers like Beba.

108.    Under its new policy, "the 'most important' factor of the Howey test" is now "an SEC-invented 'fifth shadow factor': whether the SEC wants to regulate the asset." *Peirce Digital Asset Conference Remarks*, *supra.* And "[t]he SEC wants to regulate crypto assets." *Id.* The SEC has since employed only a nominal facts-and-circumstances test in public filings, barely engaging with the particularities of the fact pattern before it, and consistently concluding that digital assets are themselves securities.

109.    The SEC began enforcing its unpublished policy by bringing far-reaching enforcement actions after Chair Gensler was appointed in 2021. In order to make this strategy of regulation by enforcement possible, the SEC doubled the size of its "Crypto Assets and Cyber" enforcement unit in 2022. And it began enforcing against and investigating a wide range of digital asset businesses and individuals pursuant to its policy. *SEC Nearly Doubles Size of Enforcement's Crypto Assets and Cyber Unit*, SEC (May 3, 2022), perma.cc/YAQ9-U2DV.

110.    Nowhere is the SEC's new policy more evident than in the change of its enforcement approach to major digital asset exchanges. Before the SEC had settled on this new policy, the SEC's position was that "[w]e need additional Congressional authorities" to exercise authority over major sectors of the digital asset industry. Gensler, *Remarks Before the Aspen Security Forum*, SEC (Aug. 3, 2021), perma.cc/2UPR-

WNA9. Now, it says "we have enough authority" to exercise authority over those sectors. *SEC's Gensler: The 'Runway Is Getting Shorter' for Non-Compliant Crypto Firms*, Yahoo! News (Dec. 7, 2022), tinyurl.com/5n9ytfys.

111.   Before, the SEC's position was that "there is no federal authority to actually bring a regime to the crypto exchanges." Pound, *SEC Chairman Gary Gensler Says More Investor Protections Are Needed for Bitcoin and Crypto Markets*, at 12:53-59, CNBC (May 7, 2021), perma.cc/HP22-5K59. Now, even though there has been no material change in federal statute or regulation, the SEC's position is that the rules are "in place" and those exchanges must "work with the SEC to get into compliance." *SEC's Gensler: The 'Runway Is Getting Shorter' for Non-Compliant Crypto Firms*, Yahoo! News, *supra*.

112.   Before, the SEC's position was that "only Congress" could add "investor protection to the crypto exchanges." *Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide*, Part III, 117th Cong. 1, 12 (May 6, 2021), perma.cc/G8MD-2NTV. Now, the SEC's position is that "basic protections in our securities laws for 80 or 90 years apply to this field as well" and "these platforms" must "come into compliance" and will be prosecuted. *SEC's Gensler: The 'Runway Is Getting Shorter' for Non-Compliant Crypto Firms*, Yahoo! News, *supra*.

113.   The change in the SEC's policy does not just impact secondary markets, but also indirectly impacts token creators and issuers who may wish for a secondary market for their tokens for any number of reasons. The SEC's newfound willingness to label tokens trading on secondary markets as "crypto asset securities," with only a

nominal facts-and-circumstances test in public filings, therefore prejudices token creators and issuers like Beba. These entrepreneurs now face increased challenges to establishing secondary markets for their tokens and may have their tokens unfairly labeled by the SEC as "crypto asset securities" in proceedings that they are not able to participate in.

114.   The change in the SEC's policy also directly impacts token creators and issuers. The SEC has taken a uniquely harsh stance against entities like Beba who create and make initial distributions of digital assets, including via free airdrops. The SEC has brought enforcement actions against token creators who distribute via airdrop even when they receive *no* money in exchange for the distribution of their token. Instead, the SEC says that the *Howey* test's "investment of money" requirement is satisfied by any theoretical benefit, such as boosts on social media, even when the token recipient pays the distributor no money. *E.g.*, *SEC v. Sun*, No. 1:23-cv-02433 (S.D.N.Y); *SEC Charges Crypto Entrepreneur Justin Sun and His Companies for Fraud and Other Securities Law Violations*, SEC (Mar. 22, 2023), perma.cc/PHU7-4BTZ; *SEC v. The Hydrogen Technology Corp.*, 1:22-cv-08284 (S.D.N.Y); *In re Tomahawk Exploration LLC*, Securities Act Rel. No. 10530 (Aug. 14, 2018).

115.   The SEC has said that "the lack of monetary consideration for digital assets, such as those distributed via a so-called 'air drop,' does not mean that the investment of money prong is not satisfied; therefore, an airdrop may constitute a sale or distribution of securities. In a so-called 'airdrop,' a digital asset is distributed to

holders of another digital asset, typically to promote its circulation." *Framework for "Investment Contract" Analysis of Digital Assets*, SEC, *supra*. The SEC has said that "[i]n determining whether an investment contract exists, the investment of 'money' need not take the form of 'cash'" and "[i]n spite of *Howey*'s reference to an 'investment of money,' it is well established that cash is not the only form of contribution or investment that will create an investment contract." *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO* (Exchange Act Rel. No. 81207), SEC (July 25, 2017).

116.   The SEC has applied this analysis to bring enforcement actions against distributors like Beba. For example, it brought an enforcement action against an oil and gas exploration company that distributed tokens by airdrop, including to recipients who paid no money but simply promoted the company. *See Tomahawk,* Securities Act Rel. No. 10530, *supra*. The SEC targeted Tomahawk because "the issuer provided tokens to investors in exchange for services designed to advance the issuer's economic interests and foster a trading market for its securities"—such as simple promotional steps. *See Framework for "Investment Contract" Analysis of Digital Assets*, SEC, *supra*.

117.   After the SEC finalized its policy that nearly all digital assets are presumptively investment contracts and all digital asset transactions are presumptively securities transactions, the SEC ramped up its enforcement efforts, consistently applying its policy directly to token creators and issuers.

118.    The SEC continued to target airdrops, taking an even wider view of what constitutes an "investment of money." For example, the SEC prosecuted a company, Hydro, for distributing digital assets, which it said constituted an unlawful sale of securities, where the "goal in carrying out the airdrop was to widely disseminate and promote the Hydro token to create a broad secondary market for Hydro." Compl., *SEC v. The Hydrogen Tech. Corp.*, No. 1:22-cv-08284 (S.D.N.Y Sep. 28, 2022) at ¶¶43-45.

119.    The SEC also targeted Hydro for distributing tokens for free but in connection with marketing efforts. *See Hydrogen* Compl. ¶48. It suffices for the SEC that token recipients "like" and engage with social media posts that benefit the distributor, even where they do not pay the distributor any money. *See Sun* Compl. ¶¶109-33. Social media engagement is not "money" as a matter of law or common sense.

120.    The SEC has even brought enforcement actions when a token creator receives no money but benefits only in the form of token recipients engaging in an "emoji contest," where recipients used emojis to post on social media about a foundation. *Sun* Compl. ¶56, *supra.* Participating in an "emoji contest," or other forms of social media posts, the SEC believes, is "valuable consideration," amounting to an investment of money. *Id.* ¶¶56, 115-133.

121.    And the SEC has taken the mistaken position that the other factors of the *Howey* test for an "investment contract" are routinely satisfied, regardless of whether it has sufficiently alleged there is an "investment of money," when a token creator makes public statements and marketing efforts to execute its business plan and use its token

36

to reach a wider audience. *E.g.*, *Coinbase* Compl., *supra* (alleging that tokens are securities based on distribution and promotion). The SEC has brought other enforcement actions against creators of digital assets who engage in conduct similar to Beba's.

122.    The SEC will continue on this path of regulation by enforcement against companies like Beba. A reporter asked Chair Gensler at the end of 2022: "So should we expect more enforcement action then?" Chair Gensler said, "We have 1,300 people in our enforcement division. We have 1,100 people in our examination division" and the SEC has "a robust enforcement history in the crypto space" including "over 100 actions, a couple of dozen while I've been here as chair, against crypto exchanges, against crypto lending platforms, against of course, tokens." *SEC's Gensler: The 'Runway Is Getting Shorter' for Non-Compliant Crypto Firms*, Yahoo! News, *supra*. He said to the digital asset industry, "Come into compliance. *Your field will not last long outside of public policy norms.* I might be technology neutral. But I'm paid not to be public policy neutral." *Id.* (emphasis added); *accord* Chervinsky & Coppel, *Chair Gensler Must Recuse Himself from Digital Asset Enforcement Decisions*, Blockchain Ass'n (Jun. 29, 2023), perma.cc/K97K-4354 (cataloging similar statements from Chair Gensler).

123.    Although Beba is a small business that wishes in good faith to use digital assets to bolster its product offerings, it cannot plan its affairs with the SEC's "regulatory sword of Damocles" hanging over its head. *Statement on ShapeShift AG*, SEC, *supra*. The SEC has rapidly increased its enforcement actions against honest secondary market participants for the act of dealing in digital assets alone. *E.g.*, *Coinbase* Compl.,

*supra*; *see also* Peirce, *Overdue: Statement of Dissent on LBRY*, SEC (Oct. 27, 2023), perma.cc/KM65-3PGS ("Why go after a company that sold a token for a functioning blockchain with an established use when we could have pursued plenty of other projects that were outright frauds and did not attempt to comply with the securities laws?"). It has been chided by other courts for its overzealous enforcement actions that represent a "gross abuse of the power entrusted to it by Congress," and have risen to the level of "pervasive misconduct" that "demonstrates a pattern of organizational bad faith and broadly implicates the Commission itself—not just isolated individuals." *See SEC v. Dig. Licensing Inc.*, 2024 WL 1157832, at *32, *17 n. 284 (D. Utah Mar. 18). And it likewise prosecutes seemingly random individuals and small companies without clarity on why some individuals versus others are targeted if "most" of the hundreds of thousands of tokens are securities. Gensler, *Speech: Kennedy and Crypto*, *supra*; *see* Peirce, *Overdue: Statement of Dissent on LBRY*, SEC (Oct. 27, 2023), perma.cc/KM65-3PGS; *see also, e.g.*, Compl., *SEC v. Wahi*, No. 2:22-cv-1009 (W.D. Wash. filed July 21, 2022); *accord Statement on ShapeShift AG*, SEC, *supra* ("The standards are so opaque and arbitrary that the Commission itself is unwilling to stand by its own analysis."). Beba therefore rightfully fears that it will be the SEC's next target.

### VII.   Beba is entitled to declaratory relief.

124.   Beba credibly fears that the SEC will bring an enforcement action related to its airdrop distributions of BEBA tokens.

125.   BEBA tokens are not registered with the SEC. Therefore, if BEBA tokens are securities, it would be unlawful for Beba to offer or sell them. *See* 15 U.S.C. §77e.

126.   The SEC poses a credible threat of enforcement against Beba for its distribution of BEBA tokens because the SEC has consistently taken the view that even without an investment of "money" in a common enterprise, a contract, or a properly-conceived reasonable expectation of profits based on the efforts of others, digital asset distributions are presumptively investment contracts. It views most, if not all initial distributions of digital assets as securities offerings. The SEC is wrong, but it routinely brings enforcement actions based on its overbroad view of the law. *See Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 485 (9th Cir. 2024) (requiring "substantial threat of enforcement, and not the likelihood that any such enforcement action would ultimately lead to sanctions").

127.   The SEC has not disavowed enforcement against Beba or similarly situated companies. Instead, it has gone to great lengths to indicate that distributions like Beba's are securities offerings within its authority and therefore illegal. It says that the "vast majority" of digital assets like the BEBA token are securities, that the regulations prohibiting their unregistered distribution are already "in place," and it threatens to "continue on the course with more enforcement actions. And [Chair Gensler] would have to say that the runway is getting shorter." *SEC's Gensler: The 'Runway Is Getting Shorter' for Non-Compliant Crypto Firms*, Yahoo! News, *supra*; Gensler, *Speech: Kennedy and Crypto*, SEC, *supra*; Gensler, *Testimony of Chair Gary Gensler Before the*

*United States House of Representatives Committee on Financial Services*, SEC (Apr. 18, 2023), perma.cc/BM82-W6MX.

128.    Beba wants its rights adjudicated now because it cannot operate under this cloud of uncertainty. The Declaratory Judgment Act exists for precisely this reason.

**VIII. The SEC's adoption of a new rule without notice and comment.**

129.    The SEC could have provided an opportunity for notice and comment on its new policy, but instead chose not to publish its policy through a formal rulemaking process. Notice and comment would have allowed the SEC to understand how its new policy would affect the digital asset industry, set clear expectations to affected parties like Beba and DEF, and subjected the policy to normal judicial review to the extent that it exceeded its statutory authority. It would have also served the goals of maintaining fair, orderly, and efficient markets. Instead, the SEC's new policy is in the multitude of complaints it has filed against digital asset industry participants.

130.    In the early years of the digital asset industry, the SEC employed the more nuanced "facts and circumstances" test: "Whether a particular digital asset at the time of its offer or sale satisfies the *Howey* test depends on the specific facts and circumstances." *Framework for "Investment Contract" Analysis of Digital Assets*, SEC, *supra.* The SEC acknowledged that "the digital asset would not be an investment contract" in certain factual scenarios. *Id.* Before Chair Gensler took office, the SEC released guidance to this effect to the industry and brought enforcement actions most often

based on the specific nature of the transaction at issue or in circumstances with indicia of fraud.

131.    In 2018, an SEC senior official acknowledged that a digital asset "all by itself is not a security." Hinman, *Digital Asset Transactions: When Howey Met Gary (Plastic)*, SEC, *supra*. The SEC official specifically said that transactions involving the two most common digital assets, bitcoin and ether, were typically not securities. *Id.*

132.    Then-Chairman Clayton agreed. He explained that whether a digital asset transaction is a security is a "facts-and-circumstances analysis." Clayton, *Remarks on Capital Formation at the Nashville 36|86 Entrepreneurship Festival* (Aug. 29, 2018), tinyurl.com/58wn8rz2. The implications of this approach were important. "When the tokens are not being sold as investment contracts," explained a Commissioner, "they are not securities at all." Peirce, *Regulation: A View from Inside the Machine* (Feb. 8, 2019), tinyurl.com/2dmt2u47.

133.    Digital assets "sold for use in a functioning network, rather than as investment contracts, fall outside the definition of securities." *Id.* Under the SEC's then-approach, "it is the nature of the transaction that determines whether an offering of securities has occurred, not the item being sold." *Id.* (citing Hinman, *Digital Asset Transactions: When Howey Met Gary (Plastic)*, SEC).

134.    Official SEC publications confirmed the SEC's approach at the time. *E.g.*, *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO*, *supra* (security analysis depends on "facts and circumstances" of transaction); *Framework*

*for "Investment Contract" Analysis of Digital Assets*, SEC, *supra* ("[w]hether a particular digital asset at the time of its offer or sale satisfies the *Howey* test depends on the specific facts and circumstances").

135.    Now-Chair Gensler, then a professor, agreed with this approach in 2018. He explained that "3/4 of the [crypto asset] market is non-securities." "It's just a commodity, a cash crypto." Gensler, *Lecture Transcript: Blockchain and Money*, *supra*.

136.    But after Chair Gensler took office, the SEC adopted a radical new policy and began aggressively enforcing it. Under its new policy, nearly all digital assets are securities and the majority of transactions involving digital assets are securities transactions. No longer did the SEC truly apply a transaction-specific facts-and-circumstances test to determine whether a digital asset or digital asset transaction was a security; instead, it engaged in only nominal analysis in public documents.

137.    Chair Gensler announced to the public in 2022 that the "vast majority" of digital assets themselves "are securities," so their initial distribution and later sale are unlawful without registration. *See* Gensler, *Speech: Kennedy and Crypto*, SEC, *supra*; Gensler, *Testimony of Chair Gary Gensler Before the United States House of Representatives Committee on Financial Services*, SEC, *supra*.

138.    Chair Gensler said that all digital assets "other than bitcoin"— including digital assets that the SEC previously said were not securities—"at the core… are securities." Khardori, *Can Gary Gensler Survive Crypto Winter?*, N.Y. Mag., *supra* (emphasis added).

139.   As one Commissioner has observed, the SEC now "repeat[s] the mantra that all, or virtually all, tokens are securities." *Peirce Digital Asset Conference Remarks*, *supra*. And "the 'most important' factor of the Howey test" is now the "SEC-invented 'fifth shadow factor': whether the SEC wants to regulate the asset," which is answered in the affirmative for digital assets. *Id.*

140.   The SEC then increased the cadence of its enforcement actions against practically everyone involved in the digital asset industry, including those who simply bought and sold digital assets or made trading available on secondary markets. *E.g.*, *Wahi* Compl., *supra*; *Coinbase* Compl., *supra*; *Binance* Compl., *supra*; *Payward* Compl., *supra*.

141.   These enforcement actions represented a dramatic increase in the SEC's view of its authority. *See SEC Enforcement of Cryptocurrency Reaches a New High* (Jan. 24, 2024), perma.cc/DXL7-K3UN ("More than 50% increase in SEC cryptocurrency-related enforcement actions in 2023 over 2022 . . . In the first quarter of 2023 alone, the SEC brought 20 actions, the highest number in a single quarter"); Cornerstone Research, *SEC Cryptocurrency Enforcement*, at 1 (2022 update), perma.cc/WQ8B-3U7L (SEC enforcement actions up 50% between 2021 and 2022); Cornerstone Research, *SEC Cryptocurrency Enforcement*, at 2 (2023 update), perma.cc/UN4B-VBY7 (SEC administrative proceedings tripled).

142.   As one Commissioner recently put it, the SEC is in "enforcement-only mode." Nelson, *SEC in 'Enforcement-Only Mode' for Crypto, Commissioner Peirce Says at ETHDenver*, CoinDesk (Feb. 29, 2024), perma.cc/5T68-M94R; *see also* Peirce, *Overdue:*

*Statement of Dissent on LBRY*, SEC (Oct. 27, 2023), perma.cc/KM65-3PGS (criticizing "the Commission's misguided enforcement-driven approach to crypto").

143.     The SEC's adoption of its new policy, per the complaints that it has filed against digital asset industry participants, is a rule that represents the consummation of its decisionmaking process and determines the rights and obligations of the digital asset users whose activity it effectively prohibits. It substantially affects the industry and consumers because it threatens to penalize in the United States practically all of the transactions fundamental to the existence of digital assets.

144.     The SEC's new policy represents a "policy change" that has "'controlled' the outcome of its" enforcement decisions after it adopted it. *Walmart Inc. v. DOJ*, 21 F.4th 300, 309 (5th Cir. 2021).

145.     The SEC's new policy is a rule that reflects "internal agency position" that "dictate[s] the result in a category of" enforcement decisions taken by the agency. *Id.*

146.     The SEC will be required to produce in the administrative record documents constituting the new policy.

147.     The SEC's new policy holds that virtually all new digital asset tokens are securities. It does so based on bare-minimum facts about the tokens, far short of what is typically required to establish a security. *E.g.*, *Coinbase* Compl., *supra* (alleging that 13 tokens were securities based on facts such as creators' blog posts detailing availability of tokens, descriptions of the company's development, and generic statements about the tokens' value). It routinely refers to all digital assets relevant to a proceeding as

"crypto asset securities," concluding without any analysis that secondary market actors are subject to its jurisdiction for including digital assets in their businesses. *See id.* ¶102; *see also Shapeshift AG* Order, at 2 (Mar. 4, 2024), bit.ly/49gDuty (concluding "ShapeShift platform allowed customers to effect exchanges of at least 79 crypto assets… that were offered and sold as securities" without naming or analyzing a single digital asset).

148.   The SEC's new policy also raises the risk that any digital asset company will be subject to SEC investigation, which alone existentially threatens most companies. In addition, the SEC's new policy is not published, so a path to compliance is difficult to discern, which leaves each participant in the industry at the mercy of the SEC's unbridled prosecutorial discretion.

149.   The new policy stifles innovation and puts industry participants out of business or forces them offshore. *See* Peirce, *Overdue: Statement of Dissent on LBRY*, SEC (Oct. 27, 2023), perma.cc/KM65-3PGS ("our scorched earth approach in remedying the violation was completely out of proportion to any investor harm …. The Commission's action forced a group of entrepreneurs to abandon what they built. Our disproportionate reaction in this case will dissuade people from experimenting with blockchain technology, which LBRY aptly describes as 'technology that enables dissent.' A government of a free people should welcome dissent and the technologies that enable it.").

150.   Another SEC Commissioner described the SEC's overbroad policy earlier this month: "There is one more area where there appears to be no limiting principle—

45

what constitutes a security under the investment contract test in *Howey*, which has arisen for cryptocurrencies and digital assets." *See SEC Commissioner Uyeda Remarks to the Council of Institutional Investors: Dangers of the Unbounded Administrative State*, SEC (Mar. 5, 2024), perma.cc/D2EJ-2MQJ. As he explained, "the Commission's approach to this analysis for cryptocurrencies and digital assets has been that any item sold whose value is based on the efforts of others is a security . . . . This broad reading of *Howey* would appear to scope in many common transactions in the non-digital world, including pre-purchase commitments, collectibles, art, and land." *Id.*

151.    Congress gives regulatory and enforcement power to executive agencies on the condition that they exercise that power under the strict and careful protocols of the APA.

152.    The heartland requirement of the APA is notice and comment. For any proposed new substantive policy, an agency must publish notice in the Federal Register and "give interested persons an opportunity to participate in the rule making through the submission of written data, views, or arguments." 5 U.S.C. §553(b)-(c); *see also* 5 U.S.C. §552(a)(1).

153.    The notice and comment process benefits both the public and the agency. The public benefits from a "fair warning of potential changes and an opportunity to weigh in on those changes." *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1816 (2019). And the agency is afforded "a chance to avoid errors and make a more informed decision." *Id.*

154.   Notice and comment rulemaking, in contrast to "adjudicative procedures," "give[s] notice of proposed changes before they occur." *Pfaff v. HUD*, 88 F.3d 739, 748 n.4 (9th Cir. 1996). It is by far the "better, fairer, and more effective method of implementing" a "new industry-wide policy" for digital assets. *Cmty. Television of S. Cal. v. Gottfried*, 459 U.S. 498, 511 (1983) (cleaned up). When an agency interpreting a statute seeks to take a "great leap[] forward," *Pfaff*, 88 F.3d at 748 n.4, and "prospectively pronounce[s] a broad, generally applicable requirement"—and when none of the traditional justifications for adjudication apply—it is "an abuse of discretion" for the agency to "circumvent the rulemaking procedures of the APA," *Patel v. INS*, 638 F.2d 1199, 1204 (9th Cir. 1980); *see also Ford Motor Co. v. FTC*, 673 F.2d 1008, 1009 (9th Cir. 1981).

155.   That principle is particularly strong when the "new standard, adopted by adjudication, departs radically from the agency's previous interpretation of the law, where the public has relied substantially and in good faith on the previous interpretation, where fines or damages are involved, and where the new standard is very broad and general in scope and prospective in application." *Pfaff*, 88 F.3d at 748.

156.   The notice and comment requirement applies to changes in substantive rules, even when the agency claims that it has not changed those rules. "An agency that, as a practical matter, has enacted a new substantive rule cannot evade the notice and comment requirements of the APA by avoiding written statements or other 'official'

interpretations of a given regulation." *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 630 (5th Cir. 2001); *accord W & T Offshore, Inc. v. Bernhardt*, 946 F.3d 227, 239 (5th Cir. 2019).

157.   "If a new agency policy represents a significant departure from long established and consistent practice that substantially affects the regulated industry, the new policy is a new substantive rule and the agency is obliged, under the APA, to submit the change for notice and comment." *Babbitt*, 238 F.3d at 630.

158.   The notice and comment procedure for changes in substantive rules is also required by due process. The "requirement of clarity in regulation is essential to the protections provided by the Due Process Clause." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Agencies may not "'fai[l] to provide a person of ordinary intelligence fair notice of what is prohibited,'" which they do when they make policy changes in secret rather than through notice and comment. *Id.* at 253-54 (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)); *see also Fortyune v. City of Lomita*, 766 F.3d 1098, 1105 (9th Cir. 2014) ("Entities regulated by administrative agencies have a due process right to fair notice of regulators' requirements."). Regulated parties are not required to "divine the agency's interpretations in advance or else be held liable when the agency announces its interpretations for the first time in an enforcement proceeding." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 159 (2012).

159.   The SEC's new digital asset policy presents a textbook case of where notice-and-comment rulemaking is required. The agency adopted a new substantive rule

governing the primary conduct of purportedly regulated parties. It therefore was required to go through notice and comment before adopting the policy.

160. Plaintiffs are not the first to observe that this obvious protocol should have been followed. As one Commissioner explained, the SEC should have "conduct[ed] some form of notice and comment" in setting the rules governing digital assets. *Peirce Digital Asset Conference Remarks*, *supra*. "If we seriously grappled with the legal analysis and our statutory authority, as we would have to do in a rulemaking," the Commissioner explained, "we would have to admit that we likely need more, or at least more clearly delineated, statutory authority to regulate certain crypto tokens and to require crypto trading platforms to register with us. And Congress might decide to give that authority to someone else." *Id.*

161. Notice and comment was especially important here because of the novelty and complexity of the digital asset economy, the need for input from a wide range of actors, and the incompatibility of existing rules with the securities law framework created largely in the 1930s. *See, e.g.*, Chamber of Commerce, *Letter Re: Coinbase Petition for Rulemaking – Digital Asset Issuer Registration and Reporting* (Jan. 19, 2023), bit.ly/3TtfjSM (explaining these dynamics).

162. Unlike an ad hoc enforcement approach, notice and comment rulemaking would allow for input from a wide range of stakeholders, advance the goals of transparent and orderly policy development, and result in fair notice to all market participants of what the SEC's policy actually is. *See Pfaff*, 88 F.3d at 748 n.4. It also

would allow the SEC's policy to be subject to the checks and balances of an Executive Order 12,866 cost-benefit analysis and the Congressional Review Act. *See* Exec. Order 12,866, *Regulatory Planning and Review*, 58 Fed. Reg. 51,735 (Oct. 4, 1993); 5 U.S.C. §§801-808. And it would provide a mechanism through which parties could challenge the written rulemaking in court.

163.   Therefore, "a notice-and-comment process [would have] allow[ed] broad public and internal participation in developing a sound regulatory system," including with "federal and state regulatory colleagues, people developing and using crypto, consumer protection advocates, and crypto critics to develop a reasonable regulatory approach." *Peirce Digital Asset Conference Remarks*, *supra*. By contrast, the current "enforcement-centric approach … precludes broad participation in developing what is or what doubles as a regulatory framework, even though such participation is needed to develop a sensible framework." *Id.*

164.   The regulated public has long sought clarity through a notice-and-comment rulemaking. In 2022, Coinbase, the biggest digital asset exchange in the United States, petitioned the SEC to engage in rulemaking to set the rules governing digital assets. *Petition for Rulemaking – Digital Asset Securities Regulation*, Coinbase (July 21, 2022), perma.cc/E2BG-BQ38. It "request[ed] that the Commission propose and adopt rules to govern the regulation of securities that are offered and traded via digitally native methods, including potential rules to identify which digital assets are securities." *Id.* In line with the SEC's APA-evasion pattern of "avoiding written statements or other

'official' interpretations" that would be subject to judicial and democratic accountability, *Babbitt*, 238 F.3d at 630, the SEC ignored its petition for over a year and then, after being sued, finally denied it in late 2023, Prentice et al., *U.S. SEC Says No To New Crypto Rules; Coinbase Asks Court To Review*, Reuters (Dec. 23, 2023), bit.ly/42vKqRN.

165. The impropriety of the SEC's freestyle policymaking has been underscored by Congress's parallel deliberations about how to regulate digital assets.

166. In recent years, Congress has repeatedly declined to grant to the SEC the power that the SEC has now attempted to seize for itself. Congress has created subcommittees focused on digital asset policy issues in both the House Financial Services Committee, which has jurisdiction over the SEC, and the House Agriculture Committee, which has jurisdiction over the CFTC. It has held dozens of hearings related to the regulation of digital assets and blockchain technology.

167. Congress has considered and continues to work on many legislative proposals concerning the regulation of digital assets. *See* Brett, *Congress Has Introduced 50 Digital Asset Bills Impacting Regulation, Blockchain, and CBDC Policy*, Forbes (May 19, 2022), tinyurl.com/4wzwwzre. Some of these bills would confirm that the SEC *lacks* regulatory authority over digital assets. *See, e.g.*, The Token Taxonomy Act of 2021, H.R. 1628, 117th Cong. (2021), tinyurl.com/bezac866. Others would grant that authority to the CFTC instead. *See, e.g.*, Digital Commodity Exchange Act of 2022, H.R. 7614, 117th Cong. (2022); Digital Commodities Consumer Protection Act of 2022, S. 4760, 117th Cong. (2022). The proposed or introduced bills include legislation

advanced recently from two House committees on a bipartisan basis. *See* Financial

Innovation and Technology for the 21st Century Act, H.R. 4763, 118th Cong. (2023).

168.   As one court recently summarized, "Congress …ha[s] yet to make a

definitive determination as to whether [digital assets] constitute securities, commodities,

or something else." *Risley v. Univ. Navigation Inc.*, 2023 WL 5609200, at *3 (S.D.N.Y.

Aug. 29). Congress has "conspicuously … declined" to grant the SEC the authority it

has now bestowed upon itself. *West Virginia v. EPA*, 597 U.S. 697, 724 (2022).

169.   Members of Congress have unsurprisingly voiced their displeasure at the

SEC's attempt to end-run their legislative authority through regulation by enforcement.

*E.g.*, Singh, *Congressman Torres Calls for Investigation into SEC Over its Approach to Crypto*,

Yahoo! Finance (Jul. 14, 2023), perma.cc/XPV8-GDP7. As they have explained,

"regulation by enforcement is no way to regulate." *Id.* As others explained, "the SEC

has forced digital asset market participants into regulatory frameworks that are neither

compatible with the underlying technology nor applicable because the firms' activities

do not involve an offering of securities." *Letter from Chairman McHenry et al.* (Apr. 18,

2023), perma.cc/KN6P-RF29.

170.   And as another has explained, "The SEC's attempt to shoehorn an entire

new class of assets into the existing definition of a 'security,' and thereby add to the

definition enumerated by Congress, exceeds the SEC's authority, encroaches on

Congress's lawmaking, and contravenes the separation of powers." Amicus Curiae Brief

of United States Senator Cynthia M. Lummis, *SEC v. Coinbase*, No. 1:23-cv-04738, ECF

No. 53 at 9 (S.D.N.Y. Aug. 11, 2023); *cf.* Shapero, *Republican Senators Slam SEC over 'Deeply Troubling' Conduct in Crypto Case*, The Hill (Feb. 8, 2024), perma.cc/98R9-7XXG.

**IX.    Beba and DEF are entitled to APA relief.**

171.    The SEC's new policy has had disastrous effects and been widely criticized.

172.    American entrepreneurs starting companies like Beba, who want to build businesses in this country, have no real way to do so without facing a subpoena or enforcement action from the SEC.

173.    Tens of millions of Americans who own digital assets or have jobs in the digital asset industry now must grapple with a new and unpublished legal regime— revealed piecemeal through public statements and chaotic enforcement actions—that throws the legality of that entire industry into doubt.

174.    The SEC has thereby "created arbitrary and destructive results for crypto projects and purchasers." *Peirce Digital Asset Conference Remarks*, *supra.* "Operating in such an opaque environment is very stressful for law-abiding people." *Id.*

175.    As two Commissioners recently wrote, participants in the digital asset economy are being punished harshly even where "[i]t is entirely unclear how [they were] to discern that the Commission would consider crypto assets generally—and any crypto asset in particular—a security in the form of an investment contract." *See Statement on ShapeShift AG*, SEC, *supra.*

176.   "Using enforcement actions to tell people what the law is in an emerging industry is not an efficient or fair way of regulating.... A paternalistic and lazy regulator settles on a solution like the one in this settlement: do not initiate a public process to develop a workable registration process that provides valuable information to investors, just shut it down." Peirce, *Kraken Down: Statement on SEC v. Payward Ventures, Inc., et al.*, SEC (Feb. 9, 2023), perma.cc/7HZS-C3ZW.

177.   The SEC's targeting of secondary market exchanges is economically devastating to token creators like Beba. In many enforcement actions, the SEC has chosen not to sue the actual creators of the digital assets at issue, forcing later buyers and sellers of those tokens to litigate whether they are securities in the absence of the individuals that have the most relevant information and whose interests may be most significantly affected. *See, e.g.*, *Wahi* Compl. ¶¶14-17, *supra* (asserting certain tokens were securities but not naming creators as defendants); *Coinbase* Compl. ¶¶15-16, *supra* (same); *Binance* Compl. ¶¶25-35, *supra* (same). This approach leaves token creators suffering real harm without a means by which to defend themselves.

178.   Beba is harmed by the SEC's new policy because it diminishes the value of BEBA tokens and subjects Beba to potential enforcement actions for its airdrops or later exchange of its assets. It also lessens the reach of BEBA tokens by chilling secondary market activity and foreclosing avenues by which BEBA tokens would otherwise be available. It reduces Beba's sales of its exclusive Ndovu Duffel that depends on the market for BEBA tokens. And it prevents Beba from carrying out its

planned future airdrop distribution of tokens and from enjoying the economic benefits that will result from that distribution. *See, e.g.*, *Peace Ranch, LLC*, 93 F.4th at 489 ("One purpose of pre-enforcement standing is to ensure that no law is practically unchallengeable. The risk of being sued by the state will deter many plaintiffs from testing their luck. Thus, the relevant question is whether [the plaintiff] plausibly alleged that it refrained from raising rents because of the [government's] interpretation of [the statute].").

179.    DeFi Education Fund is harmed as well. DEF is a nonpartisan research and advocacy group based in the United States. DEF's mission is to explain the benefits of decentralized finance, achieve regulatory clarity for decentralized finance technology, and realize the transformative potential of decentralized finance for everyone. Decentralized finance is part of the digital asset ecosystem.

180.    DEF advocates for decentralized finance users, participants, and software developers working to create new decentralized finance products using blockchain technology. Among other things, DEF educates the public about decentralized finance through weekly newsletters, op-eds, podcasts, and print media; meets with members of Congress to discuss decentralized finance and related issues; and submits public comments on proposed rulemakings that impact decentralized finance.

181.    The SEC's new policy injures DEF by causing it to expend resources responding to the uncertainties and problems that the policy has engendered. DEF has dedicated labor and financial resources toward educating the public on the SEC's new

policy and counteracting its negative effects. Those efforts would not be necessary if not for the SEC's new policy. They differ significantly from DEF's routine activities because they require it to understand and educate users about the effects and implications of the SEC's new policy, rather than fostering conventional domestic growth as they otherwise would. DEF must expend resources on these efforts because the SEC's new policy represents an existential threat to these digital asset users and the digital asset and decentralized finance ecosystem that DEF exists to protect and promote. DEF would otherwise expend these resources on promoting new projects and growth in the digital asset industry through grants to developers and funders.

182.   The SEC's new policy injures DEF by causing classic economic harms as well. DEF owns digital assets. The SEC's expansion of its authority and adoption of its new policy has damaged the value of those assets. In addition, DEF has received funding in digital assets previously distributed by airdrop, so DEF's economic status depends on how the SEC's policy applies to such assets. In some cases, the SEC has directly harmed the value of DEF's digital assets by alleging that they are securities. DEF also receives donations and payments in digital assets whose legality has been cast into doubt by the SEC's new policy.

183.   DEF owns and has owned since its inception a substantial number of Uniswap ("UNI") tokens. UNI is the Uniswap Protocol's governance token, and enables community ownership and active stewardship of the Uniswap protocol. UNI was distributed to historical users of the Uniswap Protocol through a free airdrop,

which occurred in September 2020, and did not involve any investment of money. The SEC's change in policy has resulted in the SEC taking high-profile enforcement steps against Uniswap Labs, the original developer of the Uniswap protocol. Those steps have included a "Wells notice" informing Uniswap Labs that SEC staff intends to recommend the Commission take legal action against it, which would include an allegation that Uniswap Labs engaged in an unregistered offer and sale of UNI tokens in violation of Section 5(a) and 5(c) of the Securities Act of 1933. UNI token value dropped over 33% upon the public learning about the SEC's Wells notice. The SEC's new policy caused it to take that action, caused that economic injury, and will continue to devalue UNI tokens into the future. As a result, DEF will suffer millions of dollars in damages.

184.    If the SEC's policy were held unlawful, each of these injuries would be redressed. Beba would no longer face a credible threat of enforcement under the securities laws. The value of BEBA tokens would increase and secondary market activity would increase. Beba would enjoy increased business through its token redemption program. Beba would be able to proceed with its planned future aidrop distribution. DEF would no longer divert resources to counteract the harms caused by the SEC's new policy. And UNI tokens and other digital assets held by DEF would no longer be devalued by the impending threat of an enforcement action.

185.    Each of these injuries will worsen without judicial relief. Beba is prevented from engaging in its planned second airdrop distribution until it gets judicial relief. It

loses money and business every day that it cannot go through with that planned transaction. Beba also loses money every day that BEBA tokens are depressed in trading volume and value as a result of the SEC's new policy, which diminishes the value of its own tokens and causes it to lose business. Delayed judicial relief also inflicts ongoing harm to DEF because of its ongoing economic injuries from the reduced value of its UNI tokens and because of its ongoing expenditure of resources on countermeasures made necessary by the new policy. These injuries increase each day and will not be recoverable in a later legal action.

## CLAIMS FOR RELIEF

### Count One
### Declaratory Judgment Act, 28 U.S.C. §§2201 et seq.
### (Plaintiff Beba LLC)

186.    Plaintiffs hereby incorporate by reference the allegations contained in all other paragraphs as if fully set forth herein.

187.    The Declaratory Judgment Act "afford[s] one threatened with liability an early adjudication without waiting until [its] adversary should see fit to begin an action after the damage has accrued." *Rowan Cos., Inc. v. Griffin*, 876 F.2d 26, 28 (5th Cir. 1989) (cleaned up); 28 U.S.C. §2201(a). In other words, it "allow[s] prospective defendants to sue to establish their nonliability." *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 504 (1959).

188.  The DJA plaintiff is entitled to have its rights adjudicated if the Court "would have jurisdiction had the declaratory relief defendant been a plaintiff seeking a federal remedy." *Standard Ins. Co. v. Saklad*, 127 F.3d 1179, 1181 (9th Cir. 1997).

189.  This Court would have jurisdiction in an action brought by Defendants because the statutes that they enforce, which make unlawful unregistered distribution of securities, are federal statutes. *See* 15 U.S.C. §77e; §77fff; *see also* 28 U.S.C. §1331.

190.  Beba's free airdrop distribution of tokens is not an unregistered distribution of securities.

191.  Beba's free airdrop distribution of tokens does not constitute an investment contract between Beba and token holders.

192.  Beba's first free airdrop of tokens—to users of Base Name Service and redeemers of Unisocks tokens who exchanged their tokens for socks—is not a securities transaction because it does not create an investment contract. Nor does it involve the investment of money, a common enterprise, a contract, or a reasonable expectation of profits based on the efforts of others.

193.  Beba's planned second free airdrop of tokens to these same groups of recipients is not a securities transaction because it does not create an investment contract; nor does it involve the investment of money, a common enterprise, a contract, or a reasonable expectation of profits based on the efforts of others.

194.  Beba's planned future free airdrop distribution of tokens—to recipients who request such transactions on the blockchain and pay a gas fee to the network—is

not a securities transaction because it does not create an investment contract; nor does it involve the investment of money in a common enterprise, a contract, or a reasonable expectation of profits based on the efforts of others.

195.    And Beba's planned future free airdrop distribution of tokens—to recipients who sign up and follow Beba on social media and Warpcast and create a Base Name Service address—is not a securities transaction because it does not create an investment contract; nor does it involve the investment of money, a common enterprise, a contract, or a reasonable expectation of profits based on the efforts of others.

196.    BEBA tokens themselves are not investment contracts.

197.    To constitute an investment contract, a transaction must involve a buyer's "investment of money" in the seller. *Howey*, 328 U.S. at 300-01. Although the SEC typically interprets the *Howey* test literally, it interprets this requirement atextually and boundlessly. Under a proper understanding, an "investment of money" means what it says. It is not enough that the person received the digital asset or that he did something insignificant in order to receive the digital asset. Investment contracts were historically understood to encompass formal investments of fiat currency from the buyer to the seller, and the SEC cannot overrun this requirement to include airdrops and other free distributions.

198.    The securities laws cannot be interpreted to cover Beba's transactions under the major questions doctrine. *See West Virginia*, 597 U.S. at 723-24. Any ambiguity

in the term "investment contract" must be interpreted in favor of Beba because the SEC's contrary interpretation would give it power over the vast and important digital asset industry.

199.    The securities laws cannot be interpreted to cover Beba's transactions under the rule of lenity. *See Cargill v. Garland*, 57 F.4th 447, 467-48 (5th Cir. 2023) (en banc), *cert. granted*, 144 S. Ct. 374 (Nov. 3, 2023). Any ambiguity in the term "investment contract" must be interpreted in favor of the regulated parties because the statute forms the basis for criminal penalties.

**Count Two**
**Administrative Procedure Act, 5 U.S.C. §§553, 701-706**
**(Plaintiffs Beba LLC and DeFi Education Fund)**

200.    Plaintiffs hereby incorporate by reference the allegations contained in all other paragraphs as if fully set forth herein.

201.    Defendants violated the APA by promulgating their new policy in excess of statutory authority without notice and comment.

202.    Defendants adopted a new and generally applicable policy toward digital assets without notice and comment and, instead, through ad hoc enforcement actions.

203.    Defendant SEC's new policy, adopted after Defendant Gensler took office, is that nearly all digital assets are securities and the majority of transactions involving digital assets are securities transactions.

204.    The new policy is final agency action. It has the force and effect of law, binds private parties because it renders unlawful a wide range of private digital asset

transactions, has formed the basis for multiple enforcement actions, and subjects users of digital assets to serious penalties.

205.   Defendants failed to prove that notice and comment were impracticable, unnecessary, or contrary to the public interest.

206.   Defendants' decision to not go through notice and comment was unlawful and an abuse of discretion.

207.   Defendants' new policy exceeds statutory authority because it covers assets that are not securities and transactions that are not securities transactions.

208.   Defendants' failure to go through notice and comment prejudiced Beba and DEF because Beba and DEF would have commented on the proposed expansion of authority to raise technical and logistical problems with applying the securities laws to digital asset transactions, policy problems with stifling a promising new area for innovation, and legal defects with the proposed expansion, including that it exceeds the SEC's authority.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court grant the following relief:

A.     A declaration that Beba's first airdrop distribution of BEBA tokens is not
an unlawful sale of securities;

B.     A declaration that Beba's planned second airdrop distribution of BEBA
tokens is not an unlawful sale of securities;

C.     A declaration that BEBA tokens themselves are not investment contracts;

D.     A declaration that Defendants violated the APA, both procedurally and
substantively, when adopting a new unpublished policy that nearly all
digital assets are securities and the majority of transactions involving
digital assets are securities transactions;

E.     An order vacating the new policy or preventing Defendants from
enforcing the new policy, including against Beba's first and second airdrop
distribution of BEBA tokens;

F.     An order awarding Plaintiffs their costs in this action, including attorneys'
fees; and

G.     Any other relief that the Court deems just and proper.

Dated: July 24, 2024       Respectfully submitted,

                             */s/ Cameron T. Norris*

J. Abraham Sutherland (pro hac   Cameron T. Norris
vice)                              (TN State Bar No. 33467)
106 Connally Street          Jeffrey S. Hetzel (pro hac vice)
Black Mountain, NC 28711     Consovoy McCarthy PLLC
Telephone: 805.689.4577      1600 Wilson Boulevard, Suite 700
                                   Arlington, VA 22209
                                   Telephone: 703.243.9423

                                   *Attorneys for Plaintiffs*