# Exhibit A

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
WACO DIVISION

|  |  |
|---|---|
| BEBA LLC and<br>DEFI EDUCATION FUND,<br><br>                Plaintiffs,<br><br>        v.<br><br>SECURITIES AND EXCHANGE COMMISSION; and<br>GARY GENSLER, Commissioner of the Securities<br>and Exchange Commission, in his official<br>capacity,<br><br>                Defendants. | Case No. 6:24-cv-153-ADA-DTG |

**BRIEF OF ANDREESSEN HOROWITZ, MULTICOIN CAPITAL, PARADIGM, UNION SQUARE VENTURES AND VARIANT AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Gilbert A. Greene
DUANE MORRIS LLP
Las Cimas IV
900 S. Capital of Texas Hwy, Suite 300
Austin, TX 78746
(512) 277-2274

Benjamin Gruenstein (*pro hac vice pending*)
Callum Sproule (*pro hac vice pending*)
Yunhao Liu (*pro hac vice pending*)
CRAVATH, SWAINE & MOORE LLP
Two Manhattan West
375 Ninth Ave
New York, NY 10001
(212) 474-1000

Dated:   October 28, 2024

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................................. ii

SUMMARY OF ARGUMENT ........................................................................................................... 2

ARGUMENT ......................................................................................................................................... 5

I.      There is a Credible Threat That the SEC Will Bring an Enforcement Action Against Beba for Its Past and Planned Airdrops of Digital Assets. ........................................................... 5

           A.      Factual Background ........................................................................................................ 7

           B.      The SEC's Prior Enforcement Actions and Public Pronouncements Present a Credible Threat of SEC Enforcement Against Companies Like Beba. ...................... 9

           C.      The SEC Offers No Explanation Why Companies Like Beba Should Not Consider the Threat of an SEC Enforcement Action Credible. .................................. 14

II.     The SEC Fails to Show That Beba Has Not or Will Not Suffer a Cognizable Harm. ............ 18

CONCLUSION .................................................................................................................................... 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis,*
  6 F.4th 1160 (10th Cir. 2021) ........................................................................................9

*Am.-Arab Anti-Discrimination Comm. v. Thornburgh,*
  970 F.2d 501 (9th Cir. 1991) ........................................................................................14

*Ciba-Geigy Corp. v. EPA,*
  801 F.2d 430 (D.C. Cir. 1986) .....................................................................................17

*Coinbase, Inc. v. SEC,*
  No. 23-3202 (3d Cir. Sep. 23, 2024) ...........................................................................18

Complaint, *SEC v. Consensys Software Inc.,*
  No. 1:24-cv-04578(TAM) (E.D.N.Y June 28, 2024) ..................................................19

Complaint, *SEC v. Hydrogen Tech. Corp.,*
  No. 22-cv-08284(LAK) (S.D.N.Y. Sept. 29, 2022) ........................................11, 12, 16

Complaint, *SEC v. Sun, et al,*
  No. 23-cv-02433(ER) (S.D.N.Y. Mar. 22, 2023) ..............................12, 13, 16, 17

*Funk v. Stryker Corp.,*
  631 F.3d 777 (5th Cir. 2011) ..........................................................................................4

*Int'l Bhd. of Teamsters v. Daniel,*
  439 U.S. 551 (1979) .........................................................................................................6

*LSO, Ltd. v. Stroh,*
  205 F.3d 1146 (9th Cir. 2000) ......................................................................................14

*Orix Credit All., Inc. v. Wolfe,*
  212 F.3d 891 (5th Cir. 2000) ........................................................................................15

*SEC v. W.J. Howey Co.,*
  328 U.S. 293 (1946) .........................................................................................................6

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014) .....................................................................................................7, 9

**Statutes & Rules**

5 U.S.C. § 706(2)(C) .............................................................................................................3, 4

15 U.S.C. § 77b(a)(1) ..............................................................................................................5

15 USC § 77b(a)(3) ................................................................................................................10

Fed. R. Evid. 201(b)..............................................................................................................4

Rule 12(b)(6) .........................................................................................................................4

**Other Authorities**

*Airdrop Marketing: Boosting Your Campaigns with Cryptocurrency Giveaways*, OMNI (Apr. 13,
    2024), https://www.omniagency.ca/post/airdrop-marketing-boosting-your-
    campaigns-with-cryptocurrency-giveaways....................................................................9

BEBA, https://bebacollection.com (last visited Oct. 27, 2024)................................................7

Benjamin Pirus, *Why Stellar Is Giving Away $124 Million In Cryptocurrency*, FORBES (Sept.
    9, 2019), https://www.forbes.com/sites/benjaminpirus/2019/09/09/why-stellar-
    is-giving-away-124-million-in-cryptocurrency ..............................................................9

Carol R. Goforth, *Regulation by Enforcement: Problems with the SEC's Approach to Cryptoasset
    Regulation*, 82 MD. L. REV. 107, 145 (2022) ..............................................................20

Chamber of Commerce, *Letter Re: Coinbase Petition for Rulemaking-Digital Asset Issuer
    Registration and Reporting*, SEC (Jan. 19, 2023), https://www.sec.gov/comments/4-
    789/4789-20155301-323657.pdf...................................................................................17

Coinbase, *Petition for Rulemaking - Digital Asset Securities Regulation*, SEC (July 21, 2022),
    https://www.sec.gov/files/rules/petitions/2022/petn4-789.pdf...................................17

*Crypto Assets and Cyber Enforcement Actions*, SEC, https://www.sec.gov/securities-
    topics/crypto-assets (last updated Oct. 23, 2024) .......................................................15

*Framework for "Investment Contract" Analysis of Digital Assets*, SEC,
    https://www.sec.gov/about/divisions-offices/division-corporation-
    finance/framework-investment-contract-analysis-digital-assets (last updated July 5,
    2024).........................................................................................................................5, 17

*Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors
    Collide, Part III, Hearing Before the H. Comm. on Fin. Servs.*, 117th Cong. 12 (May 6,
    2021) (statement of SEC Chair Gensler) ......................................................................6

*Geofencing*, VARIANT FUND (Sept. 30, 2024), https://variant.fund/articles/practical-
    guide-to-geofencing...........................................................................................................4

Hester M. Peirce & Mark T. Uyeda, *Omakase:  Statement on In the Matter of Flyfish Club,
    LLC*, SEC (Sept. 16, 2024), https://www.sec.gov/newsroom/speeches-
    statements/peirce-uyeda-statement-flyfish-091624......................................................19

Hester M. Peirce, *Kraken Down:  Statement on SEC v. Payward Ventures, Inc., et al.*, SEC (Feb. 9, 2023), https://www.sec.gov/newsroom/speeches-statements/peirce-statement-kraken-020923 .................................................................................19

Jack Schickler & Elizabeth Napolitano, *U.S. Doesn't 'Need More Digital Currency' Because It Has The Dollar, Says SEC's Gensler*, YAHOO! FIN., https://finance.yahoo.com/news/u-doesnt-more-digital-currency-141622784.html (last updated Jun. 6, 2023) ...............................................................................6

Letter from SEC to Paul Grewal, Chief Legal Officer of Coinbase Global, Inc., SEC (Dec. 15, 2023), https://www.sec.gov/files/rules/petitions/2023/4-789-letter-secretary-grewal-121523.pdf .........................................................................18

Mark T. Uyeda, *Statement on Proposed Rule Regarding the Safeguarding of Advisory Client Assets*, SEC (Feb. 15, 2023), https://www.sec.gov/newsroom/speeches-statements/uyeda-statement-custody-021523 ..........................................................19

Order, *In re ShipChain, Inc.*, Securities Act Release No. 10909 (Dec. 21, 2020) ..............................11, 16

Order, *In re Tomahawk Exploration LLC*, Securities Act Release No. 10530 (Aug. 14, 2018) .....................................................................................................10, 11, 16

Paul Grewal, *The SEC Has Told Us It Wants to Sue Us over Lend. We Don't Know Why*, COINBASE (Sept. 7, 2021) .......................................................................20

Rhea Kaw, *Coinbase Makes It Easy to Earn Yield with DeFi*, COINBASE (Dec. 9, 2021) ...........................20

Roomy Khan, *Airdrops: Marketing Genius Fueling The Crypto Renaissance*, FORBES (Mar. 13, 2024), https://www.forbes.com/sites/roomykhan/2024/03/13/airdrops-marketing-genius-fueling-the-crypto-renaissance .........................................................9

*SEC Announces Enforcement Results for Fiscal Year 2023*, SEC, https://www.sec.gov/newsroom/press-releases/2023-234 (last updated Nov. 14, 2023) ..............................................................................................15

*SEC Chair Gensler on Regulating AI, Cryptocurrencies*, Bloomberg Technology, YOUTUBE (Oct. 22, 2024), https://www.youtube.com/watch?v=fHBj7qinmzo ...............................10

*SEC's Gensler: The 'Runway Is Getting Shorter' for Non-Compliant Crypto Firms*, YAHOO! FIN. (Dec. 7, 2022), https://tinyurl.com/5n9ytfys.................................................6

Uniswap, COINBASE, https://www.coinbase.com/price/ uniswap (last visited Oct. 27, 2024) .......................................................................................................9

*Wells Submission on Behalf of Uniswap Labs*, Uniswap Labs (May 21, 2024), blog.uniswap.org/wells-notice-response.pdf....................................................13

Zeynep Geylan, *Crypto Exchanges Registered in Offshore Locations are 70% of the Top 30*, CRYPTOSLATE (Mar. 16, 2023) .................................................................20

## INTERESTS OF *AMICI CURIAE*[1]

*Amici* are venture capital and investment firms focused on investing in technological innovation across sectors and building investment portfolios that include innovative companies utilizing blockchain technology. **Andreessen Horowitz** is a venture capital firm based in Menlo Park, California that invests in companies across technology sectors including AI, biotechnology, healthcare, crypto, fintech and infrastructure. **Multicoin Capital** is a crypto-focused investment firm based in Austin, Texas that manages funds that invest in blockchain and crypto companies and digital assets. **Paradigm** is a research-driven crypto-focused venture capital firm based in San Francisco, California that funds companies and protocols from their earliest stages. **Union Square Ventures** is a venture capital firm based in New York City that invests across technology sectors at the edge of large markets being transformed by technological and societal pressures. **Variant** is an early-stage venture capital firm based in New York City that funds companies at every layer of the blockchain technology stack, from developer infrastructure and new financial markets to consumer applications.

*Amici* have significant interest in this case. Their longstanding participation in the blockchain industry underpins their strong interest in the law relating to blockchains and digital assets—and, in particular, in clear rules and regulations governing the businesses in which they invest. *Amici* have an interest in obtaining clarity concerning the jurisdiction of the Securities and Exchange Commission ("SEC") to regulate "airdrops" of digital assets—a common means of distributing digital assets that serve both to distribute control of decentralized blockchain networks to users and to market businesses. The looming threat of enforcement by the SEC harms the businesses in which *Amici*

---

[1] No counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than *Amici* or their counsel made a monetary contribution intended to fund the brief's preparation or submission.

invest and impedes technological innovation of decentralized blockchain networks and digital assets.

## SUMMARY OF ARGUMENT

The SEC has made clear, through public pronouncements and prior enforcement actions, that it believes that free airdrops of blockchain-based digital assets constitute "investment contracts" under the securities laws, which means that they are thus likely to be the subject of future enforcement activity. The blockchain industry has not had an opportunity to challenge the SEC's position because the SEC has not undertaken formal rulemaking and is instead adopting what is, at best, a creative and aggressive interpretation of the securities laws, and at worst, improper *de facto* regulation of an important emerging technology that was never envisioned by the drafters of the securities laws. Instead, individual companies that deploy airdrops, whether to distribute control of decentralized blockchain networks to users or to promote and market their businesses, are left to challenge the SEC in court if they become the subject of an enforcement action, or to conform their behavior to the SEC's position, by ceasing to develop their technologies or to promote their businesses through airdrops, or by moving their businesses outside the United States altogether.

Only one of the companies that has been charged by the SEC in connection with airdrops of digital assets has chosen to challenge the SEC in litigation, with all others settling such charges rather than challenging the merits. This, of course, is unsurprising, as the SEC has the full power of the United States Government and vastly more resources for litigation than the innovative companies utilizing blockchain technology, and the cost of fighting the SEC would risk bankrupting any such company. As a result, no court has ruled—as this Court is being asked to do—whether airdrops of digital assets are in fact investment contracts. The result is that many companies are in effect forced to act *as if* the SEC were acting within the scope of its authority granted by statute under the federal securities laws (or pursuant to a regulation that such airdrops violate the securities laws, yet without all of the procedural protections provided for by the Administrative Procedure Act (the

"APA")).  It is the role of courts to address this overreach and "hold unlawful and set aside agency action . . . in excess of statutory jurisdiction" (5 U.S.C. § 706(2)(C)) to the extent that the SEC's treatment of digital assets generally, and of airdrops in particular, exceeds its statutory authority.

Beba LLC ("Beba"), an apparel company that employs free airdrops of blockchain-based digital assets to market its business, is willing and able to challenge the SEC in litigation, having made the decision not to curtail its activities or otherwise move them overseas for fear of SEC enforcement.  Nor has it decided to flout the SEC's authority and continue to operate despite the threat of SEC enforcement.  Rather, it has asked this Court to consider whether its conduct is legal before the SEC brings any action against it—an opportunity that in the normal course would have been afforded to it had the SEC appropriately utilized formal notice-and-comment rulemaking and not informal public pronouncements and select actions that amount to "regulation by enforcement."

The SEC, however, moves to dismiss this lawsuit,[2] as part of its broader attempt to evade judicial scrutiny of its assertion of jurisdiction over digital assets.  It claims that Beba has not demonstrated an imminent credible threat of enforcement, as there has been no final agency action or specific SEC conduct taken against Beba.  *See* SEC's Mot. to Dismiss at 13.  In doing so, the SEC seeks to have it both ways: to instill the fear of enforcement in companies so that they cease to engage in digital asset airdrops, but then to claim that any such enforcement action is merely "hypothetical" when one such company refuses to conform its behavior and sues to enjoin enforcement.  *Id.* at 10.

The SEC's gambit should fail.  Companies that engage in the free airdrops of blockchain-based digital assets feel the threat of enforcement by the SEC because the SEC has made that threat clear, publicly stating that it believes nearly all digital assets are "securities," and that free

---

[2] The SEC and Chair Gensler moved jointly to dismiss the Amended Complaint.  When discussing the motion to dismiss, this brief refers to both defendants together as "the SEC."

airdrops may constitute investment contracts, even in the total absence of tangible consideration. And the SEC has made this threat "credible" by bringing at least four enforcement actions alleging that airdrops of digital assets constitute "investment contracts," and thus securities transactions. (*See infra* Part IB.) Indeed, *Amici* invest in portfolio companies that, in the face of this threat, have restricted access to airdropped digital assets to persons outside the United States—a growing trend in the blockchain industry.[3]

The SEC contends that Plaintiffs have not demonstrated the "likelihood" of enforcement, which is "contingent upon certain factors," although it does not specify what those factors are. SEC's Mot. to Dismiss at 26. There are facts that render Beba, in its view and the view of *Amici*, a poor candidate for enforcement; however, those same facts also existed in the prior enforcement actions that the SEC chose to bring. Plaintiffs are left to guess as to what additional factors the SEC would consider before bringing an enforcement action against Beba. The SEC argues that Plaintiffs have not alleged "that the Commission has engaged with [Beba]," *id.*, but surely that is not what the law requires before a company can seek a declaratory judgment. This would be especially unfair where the SEC has publicly stated that it would bring enforcement actions against companies *like Beba*, even if it did not name Beba specifically. (*See infra* Part IC.)

The SEC further argues that Beba will not suffer cognizable harm if it is not allowed to proceed with this lawsuit despite having brought enforcement actions against other companies, which allege that the conduct in which Beba is engaged is illegal. The SEC discounts any such showing

---

[3] Jake Chervinsky & Daniel Barabander, *A Practical Guide to Geofencing*, VARIANT FUND (Sept. 30, 2024), https://variant.fund/articles/practical-guide-to-geofencing. On a Rule 12(b)(6) motion, the Court can take judicial notice of certain matters "relevant to the issues at hand." *Funk v. Stryker Corp.*, 631 F.3d 777 (5th Cir. 2011). Specifically, the Court may take judicial notice of "a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); *see Funk v. Stryker Corp.*, 631 F.3d at 782 (citing *id.*).

of harm, arguing that these complaints are merely "allegations," which "do not command anyone to do anything or to refrain from doing anything." SEC's Mot. to Dismiss at 28. The SEC concludes: "It is only when a court adjudicates those allegations that rights and obligations flow, and even then not to Beba." *Id.* at 28. The irony of this statement is particularly rich, given that the SEC expects that companies should refrain from conduct that it has alleged in other lawsuits to be illegal, which has led industry participants to scour prior cases for guidance as to the SEC's position about particular conduct. While no court has ruled on these allegations, that is a result of the SEC and its targets agreeing to settle these actions. The SEC is wrong to ignore the harm that companies like Beba suffer from the threat of enforcement and the lack of clear guidelines. (*See infra* Part II.)

## ARGUMENT

**I.    There is a Credible Threat That the SEC Will Bring an Enforcement Action Against Beba for Its Past and Planned Airdrops of Digital Assets.**

Beba has previously airdropped BEBA tokens in connection with its luggage business and plans to airdrop more. Am. Compl. at ¶¶ 80-88. Through these airdrops, Beba alleges that it expects that a robust secondary market will emerge for the BEBA token. *Id.* ¶ 75. Although these airdrops do not constitute securities or securities transactions within any reasonable interpretation of the federal securities laws, the SEC has adopted an expansive position that treats essentially all airdrops of digital assets as "investment contracts," which is one of the categories of securities enumerated in the securities laws. *See* 15 U.S.C. § 77b(a)(1). What is more, outside of the SEC's broad and non-binding staff guidance and the four actions it has brought against airdrop issuers (none of which have been adjudicated on the merits),[4] the SEC has not clarified to companies trying to comply with the

---

[4]    *Framework    for    "Investment    Contract"    Analysis    of    Digital    Assets*, SEC, https://www.sec.gov/about/divisions-offices/division-corporation-finance/framework-investment-contract-analysis-digital-assets (last updated July 5, 2024) (cited in Am. Compl. ¶ 106) [hereinafter "Framework"].

law (1) whether it views digital assets like BEBA tokens in and of themselves as investment contracts, (2) if an investment contract exists only when a digital asset is airdropped or (3) if there are other factors that the SEC takes into consideration when making such a determination.  Indeed, Chair Gensler has taken positions inconsistent with the SEC's own guidance frameworks, testifying before Congress in 2021 that there is no "market regulator around . . . crypto exchanges" and that "only Congress" could bring regulatory clarity to the industry.[5] He later claimed in 2022 that "most" crypto tokens were securities and the SEC had "enough authority" to regulate the blockchain industry.[6] Around the same time, he demonstrated increasing hostility towards the technology itself, stating that "we don't need more digital currency . . . we already have digital currency, it's called the U.S. dollar."[7]

As the Supreme Court clarified nearly 80 years ago, an "investment contract" is an arrangement involving an investment of money in a common enterprise with an expectation of profits from the efforts of others.  *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–300 (1946).  Although currency need not change hands for an investment contract to exist, the SEC must show that "the purchaser gave up some *tangible and definable consideration*."  *Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 560 (1979) (emphasis added).  Under the SEC staff view, however, airdrops may constitute investment contracts under *Howey*, even when no tangible value is exchanged in return and regardless of how attenuated, theoretical or dubious the purported "valuable consideration" may in fact be.[8]  As Plaintiffs allege, the

---

[5] *Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, Part III, Hearing Before the H. Comm. on Fin. Servs.*, 117th Cong. 12 (May 6, 2021) (statement of SEC Chair Gensler).

[6] *SEC's Gensler: The 'Runway Is Getting Shorter' for Non-Compliant Crypto Firms*, YAHOO! FIN. (Dec. 7, 2022), https://tinyurl.com/5n9ytfys.

[7] Jack Schickler & Elizabeth Napolitano, *U.S. Doesn't 'Need More Digital Currency' Because It Has The Dollar, Says SEC's Gensler*, YAHOO! FIN., https://finance.yahoo.com/news/u-doesnt-more-digital-currency-141622784.html (last updated Jun. 6, 2023).

[8] Framework, at n.9.

SEC's airdrop enforcement actions demonstrate that, in its view, "the *Howey* test's 'investment of money' requirement is satisfied by any theoretical benefit." Am. Compl. ¶114.

A plaintiff has standing to pursue a pre-enforcement action if it faces a credible threat of enforcement. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). As highlighted by the SEC enforcement actions and threatened enforcement actions discussed below, Beba faces a credible threat that it will be subject to an SEC enforcement because it has engaged in substantially the same conduct as other companies that have been subject to SEC enforcement actions and investigations.

## A.    Factual Background

Beba is a small apparel company that sells high-end, handmade luggage and accessories crafted through partnerships with artisans in Kenya. Am. Compl. at ¶¶ 1, 34. Beba's online catalog of merchandise includes backpacks, duffel bags and wallets in exchange for U.S. Dollars or Kenyan Shillings.[9] To enhance its marketing efforts, Beba also uses digital assets on a blockchain, known as "BEBA" tokens, to provide recipients with the opportunity to purchase certain merchandise offerings. Am. Compl. at ¶ 3. A blockchain comprises a digital accounting ledger that tracks ownership of tokens, which are a measure of value and mediums of exchange for which ownership records are publicly recorded through the blockchain network. The maintenance of these "digital ledgers" is not dependent upon a centralized entity, but is instead facilitated by predetermined computer protocols to execute and verify each transaction that is recorded on the blockchain. In addition to tracking ownership of digital assets, certain blockchain networks facilitate decentralized applications, known as "smart contracts." Smart contracts allow services to be provided entirely on a decentralized blockchain network as opposed to on a centrally operated server. Consequently, blockchain technology can be used for numerous other purposes including finance, healthcare and supply chain

---

[9] BEBA, https://bebacollection.com, (last visited Oct. 27, 2024).

management applications.

To interact with a blockchain, users generally need to utilize a "wallet," which is typically a free application offered as a browser extension or a mobile application that allows users to verify their identity, sign in to blockchain-based applications and manage all their digital assets. Beba distributed (and plans to continue distributing) BEBA tokens for free to the wallets of qualifying recipients through airdrops. Am. Compl. at ¶ 4. BEBA recipients can use their BEBA tokens to become eligible to purchase a special-edition duffel bag at a discounted price from Beba's online store, or otherwise keep or dispose of their BEBA tokens as they see fit, similar to coupon circulars, customer loyalty points or airline miles. *Id.* ¶¶ 3, 69. An "airdrop" is simply the transfer of tokens to a user's wallet address without the exchange of tangible consideration. Instead, senders of airdrops identify qualified recipients through any number of criteria (including, for example, wallet addresses of people who hold other unrelated tokens or who have "liked" certain content on social media channels). Recipients of airdropped tokens frequently do not need to perform any action to receive the tokens—they might not even be aware that they will receive tokens via airdrop. *See id.* ¶ 79.

Companies use airdrop distributions for many purposes. Most prominently, airdrops are used to distribute the ownership and control of blockchain networks from developers to users, thereby ensuring that such networks remain open and decentralized. Decentralization is the key feature of blockchain-based systems driving the creation of a democratized, user-controlled internet and providing numerous benefits, including promoting competition, safeguarding freedom and rewarding stakeholders. In addition, airdrops of digital assets can be used to facilitate blockchain technology use and participation among a broader user base and as a marketing and brand awareness tool, including to build a fanbase or to reward loyal users of a community with incentives for engagement. For instance, in 2019, the creators of the XLM token (used to facilitate money transfers) airdropped this token for free to users of Keybase, a third-party group messaging and file transfer

service.[10]  In 2020, Uniswap Labs ("Uniswap"), the New York-based creators of UNI (a token used to participate in governance of the Uniswap protocol), rewarded more than 250,000 early adopters of its protocol with an airdrop.[11]  In the case of both XLM and UNI, the airdrops helped raise awareness about their respective projects and, in the case of XLM, measurably increased that project's userbase.[12]

**B.    The SEC's Prior Enforcement Actions and Public Pronouncements Present a Credible Threat of SEC Enforcement Against Companies Like Beba.**

Beba seeks a ruling from this Court that its past and planned free airdrops of BEBA tokens do not constitute investment contracts, and that BEBA tokens themselves are not investment contracts.  The SEC has already brought four enforcement actions, which are discussed below, in which it alleged that airdrops of blockchain-based digital assets constitute investment contracts even when the recipient did not pay any money or other tangible considerations for them.  In addition, the SEC has issued Wells notices to others in the blockchain industry, including Uniswap, indicating the imminence of additional enforcement actions.  Am. Compl. ¶ 183.  In considering whether a "credible threat of enforcement" exists, the Supreme Court has observed that "past enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical.'"  *Driehaus*, 573 U.S. 149, 164 (2014); *see also 303 Creative LLC v. Elenis*, 6 F.4th 1160, 1174 (10th Cir. 2021) ("history of past

---

[10] Benjamin Pirus, *Why Stellar Is Giving Away $124 Million In Cryptocurrency*, FORBES (Sept. 9, 2019), https://www.forbes.com/sites/benjaminpirus/2019/09/09/why-stellar-is-giving-away-124-million-in-cryptocurrency.

[11] Roomy Khan, *Airdrops: Marketing Genius Fueling The Crypto Renaissance*, FORBES (Mar. 13, 2024), https://www.forbes.com/sites/roomykhan/2024/03/13/airdrops-marketing-genius-fueling-the-crypto-renaissance; Uniswap, COINBASE, https://www.coinbase.com/price/uniswap (last visited Oct. 27, 2024).

[12] *Airdrop Marketing:  Boosting Your Campaigns with Cryptocurrency Giveaways*, OMNI (Apr. 13, 2024), https://www.omniagency.ca/post/airdrop-marketing-boosting-your-campaigns-with-cryptocurrency-giveaways.

enforcement against nearly identical conduct" contributes to a credible fear of prosecution).[13]

> (1)   *In re Tomahawk Exploration LLC*, Securities Act Release No. 10530 (Aug. 14, 2018).

In 2018, the SEC issued a cease-and-desist order against Tomahawk Exploration LLC ("Tomahawk"), an oil and gas exploration company, which sought to raise capital for an oil exploration project, both through an initial coin offering ("ICO") in which it offered TOM for sale in exchange for other digital assets such as Bitcoin and Ether, and free airdrops of digital assets, "Tomahawkcoins" or "TOM."  Order, *In re Tomahawk Exploration LLC*, Securities Act Release No. 10530 (Aug. 14, 2018), ¶ 1, 13.  Alongside the ICO, Tomahawk initiated a so-called "bounty program" whereby third parties received free TOM via airdrop after completing marketing efforts, including making requests to list TOM on trading platforms and promoting TOM on blogs, Facebook and Twitter.  *Id.* ¶ 21.  Over 80,000 TOM were airdropped to approximately 40 wallet holders.  *Id.* ¶ 22.  In an administrative proceeding against Tomahawk and its founder, the SEC alleged that not only was the ICO (which ultimately failed) an offer of securities under Section 2(a)(3) of the Securities Act of 1933 (the "Securities Act"), but so too the airdrop of TOM was a "sale."  *Id.* ¶ 33.  While "sale" is defined under the Securities Act as "every contract of sale or disposition of a security or interest in a security, *for value*," 15 USC § 77b(a)(3) (emphasis added), the SEC alleged that Tomahawk received valuable consideration from the "online promotional efforts" associated with the airdrop distributions.  Order, *In re Tomahawk Exploration LLC*, Securities Act Release No. 10530, ¶ 22  Although Tomahawk did not

---

[13] Nor is there a suggestion that a reversal of this enforcement trend is likely in the near future. In a recent interview, in response to the question of whether the SEC's enforcement-focused approach towards the blockchain industry will change, the Chair Gensler responded: "[W]e have benefited for nine decades from robust laws from Congress and rules from various agencies . . . to help promote the markets . . . and that is what we'll continue to do . . . even related to this newer market."  *SEC Chair Gensler on Regulating AI, Cryptocurrencies*, Bloomberg Technology, YOUTUBE at 7:05 (Oct. 22, 2024), https://www.youtube.com/watch?v=fHBj7qinmzo.

receive any money in exchange for its airdropped securities, the SEC nonetheless concluded that the airdrops constituted an offer of securities for purposes of the Securities Act.  The SEC's order went so far as to state that even "a '*gift*' of a security is a 'sale' within the meaning of the Securities Act when the donor receives some real benefit."  *Id.* ¶ 33 (emphasis added).

    (2)  *In re ShipChain, Inc.*, Securities Act Release No. 10909 (Dec. 21, 2020).

    Two years later, in 2020, the SEC issued a cease-and-desist order against ShipChain Inc. ("ShipChain"), a company involved in the shipping and logistics industry, also related in part to its airdrop program.  Order, *In re ShipChain, Inc.*, Securities Act Release No. 10909 (Dec. 21, 2020), ¶ 5. Like Tomahawk, ShipChain sought to raise money by selling tokens ("SHIP tokens") through an ICO, and also distributed SHIP tokens through an airdrop and bounty campaigns in which recipients participated in social media or blogging activities.  *Id.* n.1.  In its enforcement action, the SEC alleged that ShipChain's bounty campaigns constituted the offer and sale of securities because SHIP tokens were given in exchange for "promotion of the company."  *Id.* ¶ 4.  Inexplicably, as in the case against Tomahawk, the SEC did not distinguish between the tokens sold, distributed as part of bounty campaigns and simply "airdropped."

    (3)  *SEC v. Hydrogen Tech. Corp.*, No. 22-cv-08284(LAK) (S.D.N.Y. Sept. 29, 2022).

    In 2022, the SEC brought yet another enforcement action related to airdrops, this time against the Hydrogen Technology Corporation ("Hydrogen"), a fintech company, and two of its executives.  On two days in 2018, Hydrogen airdropped approximately 2.6 billion Hydro tokens to over 11,000 developers, in addition to bounty programs that distributed Hydro tokens to various recipients, including people who "liked" Hydrogen social media posts.  Complaint, *SEC v. Hydrogen Tech. Corp.*, No. 22-cv-08284(LAK) (S.D.N.Y. Sept. 29, 2022), ¶¶ 43, 45, 48, 51, 53.  Hydrogen also compensated employees with approximately 2.9 million Hydro tokens, *id.* ¶ 43, and engaged in direct sales of Hydro tokens on trading platforms.  The SEC alleged that all of these distributions were

investment contracts. Without distinguishing or otherwise articulating the permissibility of airdrops versus bounty programs, it alleged in a blanket proclamation that the "investment of money" prong had been satisfied because "participants obtained Hydro in exchange for the value of their labor, services, and efforts to market, promote, and develop the Hydrogen platform." *Id.* ¶ 134.

(4)    *SEC v. Sun, et al*, No. 23-cv-02433(ER) (S.D.N.Y. Mar. 22, 2023).

In 2023, the SEC brought an enforcement action against Justin Sun and several of his companies, including Tron Foundation Limited and BitTorrent Foundation Ltd., in connection with the distribution of blockchain-based digital assets, including through airdrops. Tron and BitTorrent had each created tokens—TRX and BTT, respectively. Complaint, *SEC v. Sun, et al*, No. 23-cv-02433(ER) (S.D.N.Y. Mar. 22, 2023), ¶¶ 13, 30. Sun and Tron conducted an ICO for the TRX token, selling it in exchange for digital assets including Bitcoin and Ether, *id.* ¶ 35, and took steps to make TRX available for trading on various platforms. *Id.* ¶ 36. The SEC did not focus its complaint only on these sales, but instead described numerous ways by which participants received TRX or BTT without paying for them, including through creative writing contests, retweeting or commenting on social media posts, or simply following certain social media accounts. *Id.* ¶¶ 51, 59, 108–12, 119, 129. The SEC alleged that BTT and TRX were offered and sold as securities, specifically investment contracts, and that *all* "purchasers, *including those who tendered value for [BTT/TRX] other than cash or crypto assets*, invested in a common enterprise alongside" the defendants. *Id.* ¶¶ 47, 88 (emphasis added). In other words, the SEC took the position that merely taking any of the above actions provided "valuable consideration" to the Tron Foundation, even by simply incentivizing people to create BitTorrent accounts. *Id.* ¶¶ 56, 61, 115. The SEC in *Sun* also extended its remit and authority one step further. In order to reward TRX holders, the BitTorrent Foundation announced plans for automatic, monthly airdrops of BTT to all holders of TRX in proportion to the amount of TRX held by such holders. *Id.* ¶ 92. Despite recipients receiving BTT for entirely passive conduct, the SEC took the position that

these airdrop recipients provided the defendants with valuable consideration in the form of increased demand for TRX, further growth in TRX trading volume and liquidity on the secondary market, upward pressure on TRX's secondary market price, promotion of BTT and the BitTorrent platform and the development of a secondary market for BTT.  *Id.* ¶ 107.

(5)     *Uniswap Wells Notice.*

In addition to its past and ongoing enforcement actions, the SEC has issued numerous Wells notices to various blockchain companies, indicating ongoing investigations and the risk of the SEC bringing additional imminent enforcement actions.  On April 10, 2024, Uniswap disclosed in a public blog post that it had received a Wells notice from the SEC, notifying it that the SEC was planning to recommend legal action against the company.  Am. Compl. ¶ 183.  In September 2020, Uniswap had airdropped its UNI token to early adopters of its blockchain platform.[14]  In Uniswap's response to the SEC's Wells notice, Uniswap revealed that the SEC alleged that Uniswap engaged in an unregistered offer and sale of UNI tokens in connection with, among other things, Uniswap's 2020 airdrop of UNI tokens.[15]  According to the Uniswap response, the SEC further alleged that the 2020 airdrop was part of a single integrated offering of UNI tokens purchased by institutional investors, distributed to Uniswap employees, and issued in connection with "liquidity mining" (a technical process by which token holders make their tokens available to provide liquidity on digital asset trading platforms).[16]

* * *

---

[14]  *Wells Submission on Behalf of Uniswap Labs*, Uniswap Labs (May 21, 2024), blog.uniswap.org/wells-notice-response.pdf.

[15]  *Id.*

[16]  *Id.* at 29.  What is more, according to Uniswap's response, there was no public solicitation or advertisement of the UNI tokens and the tokens were sold only to "accredited investors" and "sophisticated venture capital firms that often specialized in the blockchain space."  *Id.* at 27.

These enforcement actions and threatened actions are consistent with guidance that the SEC staff has issued that discussed airdrops.  In its *Framework for "Investment Contract" Analysis of Digital Assets*, the SEC staff discussed the "investment of money" prong of the *Howey* test and noted that "the lack of monetary consideration for digital assets, such as those distributed via a so-called 'air drop,' does not mean that the investment of money prong is not satisfied; therefore, an airdrop may constitute a sale or distribution of securities."  Am. Compl. ¶ 115.  Accordingly, there can be no doubt that the SEC views airdrops of tokens as investment contracts, even when there is no tangible consideration offered in return, as its consistent failure to distinguish passive airdrops from active bounty programs indicates.  This, of course, is a significant expansion of the "investment of money" prong of *Howey*, yet one that the SEC has demonstrated it is willing to make, and notably does not disclaim in its motion to dismiss.  This failure to disavow is "an attitudinal factor the net effect of which would seem to impart some substance to the fears of [plaintiffs]."  *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000) (quoting *Am.-Arab Anti-Discrimination Comm. v. Thornburgh*, 970 F.2d 501, 508 (9th Cir. 1991)).

### C.  The SEC Offers No Explanation Why Companies Like Beba Should Not Consider the Threat of an SEC Enforcement Action Credible.

The SEC argues that Plaintiffs' request for judicial intervention is premature because the SEC has taken no "final agency action" against Beba, but rather has only brought enforcement actions against other companies.  As an initial matter, the law does not require—and the SEC does not cite any case standing for the proposition—that the agency must have taken any affirmative steps as to the particular plaintiff seeking judicial intervention.  The SEC has made its position clear that airdrops such as those issued by Beba constitute investment contracts, and that it has prosecuted similar conduct by other companies.  As Plaintiffs allege in their Amended Complaint, enforcement activity involving digital assets and brought against companies utilizing blockchain technology is

14

increasing, and Chair Gensler has publicly signaled that it will increase further. Am. Compl. at ¶¶ 108-112. The SEC's agenda is set and controlled by the Chair, and the agency's Division of Enforcement reports to the Chair. The SEC has accordingly allocated significant resources to the Enforcement Division and directed the Division to focus on cases concerning blockchain-based digital assets. The blockchain sector has thus become a priority of the current Enforcement program and agency agenda.

In 2022, for example, the SEC doubled the size of its "Crypto Assets and Cyber Unit" to bolster its capabilities to bring enforcement actions in the digital asset space. *Id.* ¶ 109. In 2023, the SEC brought 35 enforcement actions targeting the digital asset industry.[17] In its fiscal report for 2023, the SEC touted its "highly productive and impactful year" against the digital asset industry, detailing its actions from alleged unregistered offerings to non-fungible tokens.[18] The SEC offers no basis to find, despite the enforcement activity detailed above and the increased enforcement activity that the digital asset industry is facing, that a company like Beba would *not* be prosecuted by the SEC.

The SEC further argues that when future enforcement activity depends on certain contingencies, courts should consider the likelihood of those contingencies occurring. SEC's Mot. to Dismiss at 2. However, in the Fifth Circuit case cited by the SEC, *Orix Credit All., Inc. v. Wolfe*, 212 F.3d 891 (5th Cir. 2000), it was clear what those contingencies were, namely, the successful discovery of certain documents supporting the plaintiff's claims. *Id.* Here, by contrast, the SEC is silent as to what, if any, contingencies would have to be fulfilled before it would commence an enforcement action. The SEC does not state what factors in Beba's case would make it more or less likely that it would be sued for its prior or planned airdrops. In fact, Beba's airdrops are analogous to those at play

---

[17] *Crypto Assets and Cyber Enforcement Actions*, SEC, https://www.sec.gov/securities-topics/crypto-assets (last updated Oct. 23, 2024).

[18] *SEC Announces Enforcement Results for Fiscal Year 2023*, SEC, https://www.sec.gov/newsroom/press-releases/2023-234 (last updated Nov. 14, 2023).

in the enforcement actions that the SEC has brought.  For example, Beba's past and planned airdrops distribute its tokens to holders of third-party tokens, that is, holders of certain other tokens are entitled to receive BEBA tokens.  Holders of these other tokens do not have to perform any other action to receive airdropped BEBA tokens.  These airdrops function in largely the same way as those in the SEC's *Sun* action.  Complaint, *SEC v. Sun, et al*, No. 24-02433 (S.D.N.Y. Mar. 22, 2023).  Given the similarity between the allegations against Sun and other companies and the facts presented by Beba, it is unsurprising that the SEC has offered no explanation *why* the threat of enforcement is not credible.

Based on the similarity of Beba's past airdrops and plans for future airdrops to the conduct of the subjects to these actions, Chair Gensler's hostility towards the industry, and how broadly the SEC interprets the concept of "investment of money," Beba faces a credible threat of SEC enforcement.  In each of the above-mentioned SEC actions, mere engagement over social media (such as those contemplated by Beba) was enough for the SEC to conclude that an "investment of money" occurred for purposes of the *Howey* analysis.  Activities such as "promoting on blogs and other online forums like Twitter," Order, *In re Tomahawk*, Securities Act Release No. 10530, ¶ 21, "promot[ing] . . . the company and its ICO through social media and blogging," Order, *In re ShipChain*, Securities Act Release No. 10909, *3, "'upvoting' (or signaling approval or, in Facebook parlance, 'liking') 'all posts' made by or from Hydrogen's Project Hydro account 'for a week,'" Complaint, *Hydrogen Tech. Corp.*, No. 22-cv-08284, ¶ 48, or even merely submitting a question in an "ask me anything" session on Discord were each an example of sufficient tangible consideration in the eyes of the SEC to constitute an "investment of money" under *Howey*.  Complaint, *Sun*, No. 24-2433, ¶ 142. Under the SEC's view, then, Beba's request for members of the public to follow it on social media or add "Beba" to their domain names prior to their receipt of an airdrop, falls squarely within the broad "promotion" sufficient to qualify as an "investment of money."  Even in the absence of any such actions, the SEC has made clear in its staff guidance that the mere occurrence of an airdrop without

16

tangible consideration whatsoever could constitute an investment contract security.[19]

        The SEC also attempts to distinguish the current action from the D.C. Circuit's decision in *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430 (D.C. Cir. 1986), in which the court held that judicial intervention was appropriate because the EPA had provided its "final word on the matter short of an enforcement action." SEC's Mot. to Dismiss at 25-26. However, that is precisely what occurred here. The SEC has shown its position to be definitive, through both its position in the enforcement actions discussed above and its refusal to provide any further guidance in rulemaking. In fact, in July 2022, Coinbase petitioned the SEC to "propose and adopt rules to govern the regulation of securities that are offered and traded via digitally native methods."[20] In its petition, Coinbase specifically asked for rulemaking governing free airdrops of tokens. *Id.* at 9 ("If the SEC is of the view that airdrops (*i.e.*, digital assets provided free of payment) constitute an investment of money—a position that is likely irreconcilable with case law—it should clearly state that position and clarify in which circumstances that would be the case." (footnotes omitted)). Following its submission, almost 1,700 parties submitted comments to the Coinbase Petition echoing the request for clear rules, while other individuals submitted letters advocating for rulemaking to the SEC.[21] When finally forced to respond by a court order nearly a year and a half after the petition was filed, the SEC responded with a terse two-page statement denying the petition, making clear that no further guidance was forthcoming.[22]

---

[19] Framework n.9.

[20] Coinbase, *Petition for Rulemaking – Digital Asset Securities Regulation*, SEC (July 21, 2022) ("Coinbase Petition"), https://www.sec.gov/files/rules/petitions/2022/petn4-789.pdf (cited in Am. Compl. ¶ 164).

[21] Chamber of Commerce, *Letter Re: Coinbase Petition for Rulemaking—Digital Asset Issuer Registration and Reporting*, SEC (Jan. 19, 2023), https://www.sec.gov/comments/4-789/4789-20155301-323657.pdf.

[22] Letter from SEC to Paul Grewal, Chief Legal Officer of Coinbase Global, Inc., SEC (Dec. 15, 2023), https://www.sec.gov/files/rules/petitions/2023/4-789-letter-secretary-grewal-121523.pdf. In fact, one judge of the Third Circuit Court of Appeals recently observed during the oral argument

**II.**    **The SEC Fails to Show That Beba Has Not or Will Not Suffer a Cognizable Harm.**

The SEC next argues that Beba cannot establish that it will suffer cognizable harm arising from the prior enforcement actions alleging that airdrops of blockchain-based digital assets are securities. The SEC's argument is two-pronged: *first*, that the allegations in these enforcement actions "do not command anyone to do anything or to refrain from doing anything"; and *second*, that no action has been brought *against Beba*, and if that day comes, Beba will be afforded the opportunity to defend itself just as those parties are. SEC's Mot. to Dismiss at 28-29. The SEC is wrong on both counts.

*First*, allegations in enforcement actions brought by the SEC are not the equivalent of allegations by a run-of-the-mill civil plaintiff; they are a window into the SEC's interpretation of the securities laws. Such statements by the federal securities regulator are of profound importance to digital asset industry participants, given that the SEC has not itself promulgated rules or guidance through rulemaking.[23] Absent rulemaking stating the SEC's position as to whether transactions in blockchain-based digital assets generally, or airdrops in particular, are securities transactions, companies are forced to scour SEC enforcement actions and a mosaic of court decisions to ascertain how the law applies. In fact, the SEC accused Consensys, a blockchain company that offers an entire suite of products for web3 developers, of offering and selling unregistered securities, and relied on its prior enforcement actions to show that Consensys knowingly sold assets that the SEC had deemed securities. Complaint, *SEC v. Consensys Software Inc.*, No. 1:24-cv-04578(TAM) (E.D.N.Y June 28, 2024), ¶ 139. The SEC has charted an increasingly broad and uneven path of regulation through enforcement, a path that the SEC's own Commissioners Hester Peirce and Mark Uyeda continue to

---

in Coinbase's case against the SEC that the SEC's high volume of enforcement actions has demonstrated that the agency is "just interested in picking off a lot of individual [cryptocurrency companies] without giving higher level guidance." Transcript of Oral Argument at 40, *Coinbase, Inc. v. SEC*, No. 23-3202 (3d Cir. Sep. 23, 2024).

[23] *Supra* note 21.

criticize, recently stating that "[l]eaving crypto to be addressed in an endless series of misguided and overreaching cases has been and continues to be a consequential mistake."[24]   And in the words of Commissioner Peirce, "[u]sing enforcement actions to tell people what the law is in an emerging industry" is not a "fair way of regulating," as "one-off enforcement actions and cookie-cutter analysis does not cut it" when it comes to providing fair notice of what the law requires.[25] Commissioner Uyeda has similarly lamented how "[f]or too long, the Commission's approach to crypto asset regulation has been to use enforcement actions to introduce novel legal and regulatory theories."[26]   It is clear that the SEC expects that companies will change their behavior based on allegations it has made in prior actions, even if those allegations were never adjudicated by a court.

   *Second*, it is unrealistic to assume that Beba, given its small size, will necessarily be able to defend itself in a future enforcement action.  In fact, of the four prior enforcement actions discussed above, three were settled rather than fought—indicating, at least the possibility, that those defendants were motivated to settle by their lack of financial resources to contest the charges and litigate against the United States government.  This highlights the unfairness to the industry of the SEC regulating by instilling in companies the fear of enforcement, and then seeking to foreclose companies from seeking review of its positions.  Often, an agency weighing the enactment of a policy or modification of its historical remit—especially one that substantially expands its jurisdiction or fundamentally alters the regulatory landscape—will only do so through notice-and-comment rulemaking pursuant to the APA.

---

[24] Hester M. Peirce & Mark T. Uyeda*, Omakase:  Statement on In the Matter of Flyfish Club, LLC,* SEC (Sept. 16, 2024), https://www.sec.gov/newsroom/speeches-statements/peirce-uyeda-statement-flyfish-091624.

[25] Hester M. Peirce, *Kraken Down:  Statement on SEC v. Payward Ventures, Inc., et al.*, SEC (Feb. 9, 2023), https://www.sec.gov/newsroom/speeches-statements/peirce-statement-kraken-020923.

[26] Mark T. Uyeda, *Statement on Proposed Rule Regarding the Safeguarding of Advisory Client Assets*, SEC (Feb. 15, 2023), https://www.sec.gov/newsroom/speeches-statements/uyeda-statement-custody-021523.

This process gives affected parties and market players an opportunity to voice their opinion about the proposed rule, and if the rule is ultimately passed, to join together and collectively challenge the rule. By contrast, when an agency proceeds directly to bring enforcement actions, the financial burden is placed exclusively on the party being sued to challenge the agency's position.  It is thus no surprise that many innovative companies utilizing blockchain technology have halted activities in the United States, instead choosing to operate in jurisdictions with clearer rules.[27]  Here, Beba faces a credible threat of enforcement for conduct that the SEC has repeatedly claimed violates federal securities laws, but the SEC has not formally provided clarity through rulemaking or otherwise to support such claims. Beba, like other industry participants, continues to suffer cognizable harm by virtue of the SEC's actions and the threat thereof.  The SEC should not be allowed to evade judicial review when a company expresses an interest in challenging its position, simply because the SEC has not yet decided to sue that company.

## CONCLUSION

Plaintiffs have adequately pleaded a credible threat of enforcement and cognizable harm.  The SEC arguments to the contrary should be rejected, and its motion to dismiss denied.

---

[27] *See, e.g.*, Am. Compl. ¶149; Carol R. Goforth, *Regulation by Enforcement: Problems with the SEC's Approach to Cryptoasset Regulation*, 82 MD. L. REV. 107, 145 (2022); Paul Grewal, *The SEC Has Told Us It Wants to Sue Us over Lend. We Don't Know Why*, COINBASE (Sept. 7, 2021); Rhea Kaw, *Coinbase Makes It Easy to Earn Yield with DeFi*, COINBASE (Dec. 9, 2021); Zeynep Geylan, *Crypto Exchanges Registered in Offshore Locations are 70% of the Top 30*, CRYPTOSLATE (Mar. 16, 2023).

Respectfully submitted,

/s/ Gilbert A. Greene
DUANE MORRIS LLP
Gilbert A. Greene
Las Cimas IV
900 S. Capital of Texas Hwy, Suite 300
Austin, TX 78746
(512) 277-2274
BGgreene@duanemorris.com


CRAVATH, SWAINE & MOORE LLP
Benjamin Gruenstein (*pro hac vice pending*)
Callum Sproule (*pro hac vice pending*)
Yunhao Liu (*pro hac vice pending*)
Two Manhattan West
375 Ninth Ave
New York, NY 10001
(212) 474-1000
bgruenstein@cravath.com
csproule@cravath.com
lliu@cravath.com


*Counsel for Amici Curiae*

October 28, 2024

21

## CERTIFICATE OF SERVICE

I hereby certify that on October 28, 2024, the foregoing document was filed through the Court's ECF system and a copy will be served on all parties according to the Federal Rules of Civil Procedure.

Respectfully submitted,

*/s/ Gilbert A. Greene*

DUANE MORRIS LLP
Gilbert A. Greene
Las Cimas IV
900 S. Capital of Texas Hwy, Suite 300
Austin, TX 78746
(512) 277-2274
BGgreene@duanemorris.com

CRAVATH, SWAINE & MOORE LLP
Benjamin Gruenstein (*pro hac vice pending*)
Two Manhattan West
375 Ninth Ave
New York, NY 10001
(212) 474-1000
bgruenstein@cravath.com
csproule@cravath.com
lliu@cravath.com

*Counsel for Amici Curiae*

October 28, 2024